**Roxanne RUPPEL, Plaintiff/Appellant,**

**v.**

**CITY OF VALLEY PARK, Defendant/Respondent.**

**No. ED 93719.**

Missouri Court of Appeals, Eastern District, Division Three.

May 18, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 14, 2010.

Application for Transfer Denied Sept. 21, 2010.

McMichael & Logan, Daniel J. McMichael, Kirkwood, MO, for Appellant.

HeplerBroom, LLC, Gerard T. Noce, Amanda M. Mueller, St. Louis, MO, for Respondent.

Before GLENN A. NORTON, P.J., MARY K. HOFF, J., and LAWRENCE E. MOONEY, J.

## OPINION

PER CURIAM.

Roxanne Ruppel (Ruppel) appeals from the trial court's grant of summary judgment in favor of the City of Valley Park (the City) on Ruppel's petition alleging that the City discriminated against her because of her sex when it terminated her employment, in violation of the Missouri Human Rights Act (MHRA), Section 213.055[1]. We reverse and remand for further proceedings.

*Factual and Procedural History*

The record in this case, viewed in the light most favorable to Ruppel, the party

1. All statutory citations are to RSMo 2000, unless otherwise indicated.

against whom summary judgment was entered,[2] establishes the following facts:

In January 2002, Ruppel began working for the City as a full-time office clerk. Ruppel was an at-will employee. Ruppel's job duties included sanitation billing, helping the building commissioner with issuing permits, and interacting with citizens at the front office counter. The City paid Ruppel approximately $12 per hour plus benefits. Later, the City asked Ruppel to perform some work on the City's website. Ruppel performed the website work from her home on an overtime basis. The City paid for training classes so that Ruppel could eventually program and maintain the website rather than paying an outside firm to do the work. The City's clerk, Marguerite Wilburn (Wilburn), was Ruppel's supervisor. According to Ruppel's personnel file, Ruppel was considered to be a good employee and performed her job duties well.

In April 2005, Jeff Whitteaker (Whitteaker) was elected mayor of the City. Wilburn was Whitteaker's sister. Whitteaker knew of Ruppel, and he had developed a favorable impression of her ability to do her job. Whitteaker believed that Wilburn appreciated having Ruppel as an employee and that Wilburn also had a favorable opinion of Ruppel. Sometimes, after meetings of the board of aldermen, Whitteaker would ask Ruppel to "go get a beer or something." Occasionally, Ruppel would meet Whitteaker and others at a tavern or a restaurant, but, on two or three occasions, Ruppel and Whitteaker went out alone. Some of the aldermen characterized Whitteaker as "flirtatious" with women.

In December 2006, Ruppel and Whitteaker began a romantic relationship.

Both Ruppel and Whitteaker were married to other people, but neither made a concerted effort to keep the relationship a secret. Some employees of the City and some members of the board of aldermen either knew about or had heard rumors about the relationship. Wilburn began to suspect Ruppel and Whitteaker were having an affair.

In early 2007, Ruppel was still fulfilling her job duties as she had before the relationship began, but Wilburn perceived that Ruppel's "attitude was different" and that the "atmosphere was different between all the employees there and [Ruppel]." Wilburn came to believe that the relationship caused "a lot of turmoil and chaos in the office." Wilburn became angry about the situation and notified Whitteaker's wife of the relationship.

On two occasions, Whitteaker's wife came to the City's place of business. On the first occasion, Whitteaker's wife asked one of the City employees to provide her with some telephone records. On the second occasion, Whitteaker's wife confronted Ruppel and asked to speak with her privately. Whitteaker's wife and Ruppel went into another office and shut the door, but Wilburn could hear them shouting at one another for several minutes. Whitteaker's wife also called Ruppel at work several times and left voice messages. At one point, Alderman Mike White (Alderman White) told Ruppel that the only way to end the turmoil in the office, which had been caused by Ruppel and Whitteaker's relationship, was for Ruppel to leave the City's employment.

In April 2007, while still performing her job duties for the City, Ruppel demonstrated a technique for placing a stamp on

---

**2.** *See ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993).

campaign literature for Alderman Steve Drake (Alderman Drake). A few days later, Wilburn issued a letter to all of the City's office employees warning them that assisting political candidates on the City's time was a violation of City policy and grounds for discipline or termination. Wilburn did not specifically discipline Ruppel.

Meanwhile, in the spring of 2007, during executive session meetings of the board of aldermen, some of the aldermen began raising questions about Ruppel and Whitteaker's relationship. All of the aldermen were males. Whitteaker, the entire board of aldermen, the City's attorney, and Wilburn were present at the executive session meetings. At one of the executive session meetings, Alderman Michael Pennise (Alderman Pennise) asked Whitteaker whether he was "having a sexual relationship with [his] secretary." At the time, Ruppel was still working as an office clerk, but some of the City's personnel and aldermen had begun describing her as Whitteaker's "secretary." Whitteaker replied, "[W]hat I do on my time is my business, and what you do on your time is your business." Alderman Pennise also said he was going to "do [Whitteaker] a favor" by firing Ruppel. Alderman Daniel Adams (Alderman Adams) commented that he "was going to try to help [Whitteaker] out."

In June 2007, at a meeting of the board of aldermen, some of the aldermen decided that Ruppel's role in showing the stamping technique to Alderman Drake two months earlier was a violation of the City's policy prohibiting employees from engaging in political activity during work hours on City property. Some of the aldermen moved to discipline Ruppel by suspending her from work for a week without pay. After discussion, it was decided that Ruppel's supervisor, Wilburn, would discipline Ruppel. However, Alderman Drake believed that "everything got completely and totally blown out of proportion," that the City's decision to discipline Ruppel for showing him how to place stamps on envelopes was "stupid" and "odd," and that "a big to do was made out of a big nothing." Nevertheless, on June 5, 2007, Wilburn issued a disciplinary notice to Ruppel referencing her alleged violation of the City's political activity policy and indicating that Ruppel would be suspended for a week without pay.

Pursuant to the procedures stated in the City's employee manual, Ruppel immediately sent to the mayor, Whitteaker, a written letter appealing her suspension and requesting a review of the matter. Ruppel complained that she should not have been disciplined at all because she had not violated any City policy by demonstrating for Alderman Drake the method for placing stamps on campaign letters. Ruppel further complained that the suspension was issued in violation of the City's policy of reprimanding employees within seven days of an incident, that the suspension was too severe for the situation, and that one of the aldermen supporting the decision to suspend her had asked Ruppel to create, on City time, a CD copy of the City's voter registration list for his own election campaign. Whitteaker subsequently issued a written directive to Wilburn finding the "punishment excessive and untimely" and "rescinding the suspension with instructions that the Notice of Suspension be removed from [Ruppel's] file and that [Ruppel] not forfeit any pay as a result of the suspension."

Whitteaker subsequently informed Ruppel that the board of aldermen was upset about the relationship and were taking steps to force Ruppel to leave the City's employment. Whitteaker told Ruppel that "he could protect [her]" because "he had control of the board." However, during a

board of aldermen meeting at which Ruppel was present, some of the aldermen appeared angry and commented publicly about Ruppel and Whitteaker's relationship. Alderman Ed die Walker (Alderman Walker), Wilburn's brother-in-law, asked whether Ruppel would quit if the board of aldermen cut her hours of employment.

Consequently, during a committee meeting on June 21, 2007, Alderman Adams introduced a motion to hire a part-time secretary for the mayor's office, beginning August 1, 2007. In addition to working for the mayor, the part-time secretary was to be responsible for managing the City's web page and for soliciting donations for the City's legal defense fund in a case involving a challenge to an ordinance. Alderman Adams suggested that Ruppel be moved from her current full-time office clerk position to the part-time secretary position. Ruppel's fulltime position included benefits; the part-time secretary position did not. In contrast, no one suggested impeaching, officially sanctioning, or reprimanding Whitteaker because of his relationship with Ruppel. In fact, Alderman Adams believed that, as long as Whitteaker was performing his duties as mayor of the City, the board of aldermen could not impeach Whitteaker for engaging in a romantic relationship with a City employee.

On August 1, 2007, Ruppel became the mayor's part-time secretary. In addition to working directly for Whitteaker, the City wanted Ruppel to continue maintaining the City's website. However, Ruppel soon found that she could not perform the duties of her new position and adequately maintain the website within the twenty-five hours she was authorized to do the work. Whitteaker suggested that Ruppel demand the board of aldermen enter into a contract for Ruppel to perform the website maintenance. Ruppel subsequently informed the board of aldermen that she would continue the website work only if the board would agree to pay her for the work at a rate of $35 per hour. The board of aldermen refused Ruppel's offer. Some of the aldermen stated that Ruppel had ample time in her position as Whitteaker's secretary to be able to continue the website work along with her other job duties.

In September 2007, the board of aldermen voted to amend the City's salary and budget ordinance in order to completely eliminate Ruppel's position as the mayor's secretary. Both Whitteaker and Alderman Drake opposed the decision on the ground that the remainder of the City's office staff would be unable to get the work done if there was a reduction in staff. Nevertheless, Whitteaker signed the amendment that same day. Wilburn subsequently called Ruppel to inform her of the board of aldermen's decision. Wilburn claimed that Ruppel's position was eliminated for budgetary reasons and because Ruppel refused to provide maintenance for the City's website. Later, however, Wilburn stated she knew of no decrease in the City's budget that made the elimination necessary. In fact, after firing Ruppel, the City hired an outside firm to maintain the website at a rate of more than $35 per hour.

At around the same time the board of aldermen decided to eliminate Ruppel's position, Ruppel informed Whitteaker that she was ending their romantic relationship. Whitteaker continued to call Ruppel for about four months, and, eventually, the relationship started up again. Ruppel and Whitteaker's relationship continued, on and off, until January 2009.

In late 2007, Ruppel filed a complaint with the Missouri Commission on Human Rights (MCHR) alleging the City had discriminated against her on the basis of her sex when it demoted and fired her. Fol-

lowing an investigation, the MCHR issued a right-to-sue letter to Ruppel. Ruppel thereafter filed her petition against the City requesting actual damages for lost income, punitive damages, and attorney's fees.

The City filed its motion for summary judgment, memorandum of law, and statement of uncontroverted material facts alleging that it was entitled to judgment as a matter of law because Ruppel could not prove the elements of a *prima facie* case of discriminatory termination in that Ruppel was unable to show that her sex was a contributing factor in the termination. After subsequent responses by Ruppel, including statements of disputed material facts, and additional pleadings by the City, the trial court entered its summary judgment in favor of the City.

This appeal follows. Additional facts will be discussed as necessary to our resolution of the issues on appeal.

### Standard of Review

■ Whether the trial court's grant of summary judgment was proper is a question of law that we review *de novo*. *Todd v. Missouri United School Ins. Council,* 223 S.W.3d 156, 160 (Mo. banc 2007); *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper when the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 74.04(c); *Todd,* 223 S.W.3d at 160. Where the defending party is the movant, it may establish a right to judgment by showing one or more of the following: (1) facts negating any one of the non-movant's elements facts; (2) that the non-movant, after an adequate period of discovery, has not been able and will not be able to produce evidence sufficient to allow the trier of fact to find the existence

of any one of the non-movant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *ITT,* 854 S.W.2d at 381. Most importantly, we review the record in the light most favorable to the party against whom summary judgment was entered. *Id.* at 376. We take as true the facts set forth by affidavit or otherwise in support of the moving party's motion unless contradicted by the nonmoving party's response. *Ehrhardt v. Herschend,* 294 S.W.3d 58, 59 (Mo.App. S.D. 2009). We accord the non-moving party the benefit of all reasonable inferences from the record. *Id.,* 294 S.W.3d at 59. Furthermore, where competent materials in the record show there are two plausible but contradictory accounts of the necessary facts, there exists a genuine issue for trial. *Risher v. Farmers Ins.,* 200 S.W.3d 84, 88 (Mo.App. E.D.2006).

### Discussion

■ In her sole point on appeal, Ruppel claims the trial court erred in sustaining the City's motion for summary judgment because she presented evidence establishing a genuine dispute over issues of material fact regarding the City's unlawful motivations in sanctioning, demoting, and terminating her employment. We agree.

■ It shall be an unlawful employment practice for an employer to fail or to refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of that individual's race, color, religion, national origin, sex, ancestry, age, or disability. Section 213.055.1(1)(a). "Nothing in this statutory language of the MHRA requires a plaintiff to prove that discrimination was a substan-

tial or determining factor in an employment decision; if consideration of age, disability, or other protected characteristics contributed to the unfair treatment, that is sufficient." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 819 (Mo. banc 2007). To establish a *prima facie* case of sex discrimination in the workplace, the employee must satisfy four elements: (1) she was a member of a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males. *Buchheit, Inc. v. Missouri Commission on Human Rights*, 215 S.W.3d 268, 277 (Mo. App. W.D.2007). "The fourth element of a *prima facie* discrimination case also can be met if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination.'" *Id.*, 215 S.W.3d at 277 (citations omitted).

■ Summary judgment is seldom used in employment discrimination cases because such cases are inherently fact-based and often depend upon inferences, not on direct evidence. *Daugherty*, 231 S.W.3d at 818. "Summary judgment should not be granted unless evidence could not support any reasonable inference for the non-movant." *Id.* However, a plaintiff's claim of sex discrimination may survive summary judgment if she demonstrates the existence of genuine issues of material fact as to whether her sex was a contributing factor in her employer's employment decision against her. *Id.* at 820. Missouri courts analyze summary judgment decisions in Section 213.055 claims under the standards set forth in Missouri Approved Instruction (MAI) 31.24, which provides, in pertinent part:

Your verdict must be for plaintiff if you believe:

First, defendant (*here insert the alleged discriminatory act, such as "failed to hire," "discharged" or other act within the scope of Section 213.055, RSMo*) plaintiff, and

Second, (*here insert one or more of the protected classifications supported by the evidence such as race, color, religion, national origin, sex, ancestry, age, or disability*) was a contributing factor in such (*here, repeat alleged discriminatory act, such as "failure to hire," "discharge," etc.*), and

Third, as a direct result of such conduct, plaintiff sustained damage.

*[unless you believe plaintiff is not entitled to recover by reason of Instruction Number (*here insert number of affirmative defense instruction*)].

MAI 31.24 (6th Ed. Supp.2007); *Daugherty*, 231 S.W.3d at 820; *Stanley v. Jerden Foods, Inc.*, 263 S.W.3d 800, 803 (Mo.App. W.D.2008).

Here, after applying the "contributing factor" analysis to Ruppel's discrimination claim, we find the claim survives summary judgment because Ruppel has demonstrated the existence of genuine issues of material fact as to whether her sex was a "contributing factor" in the City's decision to terminate her employment.

In its motion for summary judgment, its memorandum of law in support of the motion, and its statement of uncontroverted material facts, the City argued it was entitled to judgment as a matter of law on Ruppel's claim because there was no genuine dispute that Ruppel and Whitteaker's relationship was "wholly consensual;" that the relationship resulted in "constant struggle" and "turmoil" in the office, including verbal altercations with Whitteaker's wife, and "may have been disruptive;" that Ruppel violated the City's political activity policy by placing a stamp on Alderman Drake's election campaign literature; that Ruppel was terminated because

the board of aldermen eliminated her position; and that Whitteaker could not be disciplined in the same manner as Ruppel because he was an elected official.

While a jury could believe the City's evidence in this regard, on summary judgment, the trial court is required to resolve all factual issues in favor of the non-moving party. According to the record, during the MCHR investigation of Ruppel's claim, the City asserted that it had offered Ruppel the position as a part-time secretary after it eliminated her position as office clerk, that Ruppel had "accepted" the part-time position, and that it had later fired Ruppel for "budgetary reasons" and "her refusal to provide internet maintenance" after she had been trained to do so at the City's expense. However, Ruppel presented evidence demonstrating that the City provided conflicting reasons for her termination while "nothing happened" to Whitteaker. Wilburn testified in deposition that Ruppel was fired due to a change in the budget, but Wilburn did not know of any decrease in the City's budget that made the elimination of Ruppel's position necessary. Other evidence showed that the board of aldermen was opposed to paying Ruppel $35 per hour to maintain the City's the website, yet it hired an outside firm to continue maintaining the website at a rate of more than $35 per hour after Ruppel's position was eliminated. The evidence also indicated that Ruppel was considered to be a good employee and performed her job duties well, but some of the aldermen were angry and upset about her relationship with Whitteaker. The evidence indicated that Alderman White had told Ruppel that the only way to end the turmoil in the office was for her to leave the City's employment. In contrast, Whitteaker testified in deposition that he was never impeached,

sanctioned, or censured by the board of aldermen after it learned of the relationship. Alderman Adams testified in deposition that, as long as Whitteaker was performing his duties as mayor of the City, the board of aldermen could not reprimand or impeach Whitteaker for engaging in the relationship with Ruppel. From this evidence, a jury could infer that the City discriminated against Ruppel on the basis of her sex. "Inconsistencies in the explanations advanced by an employer for an employee's termination are sufficient to establish that the reasons proffered by the employer were not the true reason for the employee's termination." *Buchheit*, 215 S.W.3d at 278. Furthermore, if two plausible, but contradictory, accounts of essential facts exist in the record, a genuine issue of material fact remains to be resolved; thus, summary judgment is inappropriate because fair minded people, exercising reasonable judgment, could reach different conclusions on the issue in controversy. *Francin v. Mosby, Inc.*, 248 S.W.3d 619, 621 (Mo.App. E.D.2008) (quotations omitted). The determination of such facts is for the fact finder at trial. *Id.*, 248 S.W.3d at 621–22. Point granted.

### Conclusion

Because the record contains evidence of disputed issues of material fact as to whether Ruppel's sex was a contributing factor in her termination, the trial court erred in entering summary judgment in favor of City on Ruppel's claim of employment discrimination. The trial court's judgment is reversed and remanded for further proceedings.[3]

---

3. This Court's decision that Ruppel's claim

survives summary judgment under the MAI

31.24 "contributing factor" analysis is not a declaration that she will prevail at trial. The record in this case reveals the existence of disputed issues of material fact that should be weighed by the trier of fact; thus, summary judgment is inappropriate. *See Daugherty*, 231 S.W.3d at 825, n. 16.