Danny HOLMES, Appellant–
Respondent,

v.

KANSAS CITY MISSOURI BOARD OF
POLICE COMMISSIONERS, by and
through ITS MEMBERS, Respon-
dent–Appellant.

Nos. WD 72852, WD 72853.

Missouri Court of Appeals,
Western District.

Jan. 31, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 28, 2012.

Application for Transfer
Denied May 29, 2012.

Lyle Gregory, Raymore, MO, Susan Robertson, Kansas City, MO, for Appellant–Respondent.

William Quirk, Anthony Bonuchi, Diane Peters, Kansas City, MO, for Respondent–Appellant.

Before: ALOK AHUJA, P.J., THOMAS H. NEWTON, and JAMES EDWARD WELSH, JJ.

THOMAS H. NEWTON, Judge.

Mr. Danny Holmes, a former police officer of the Kansas City Missouri Police Department (KCPD), and the Kansas City Board of Police Commissioners (the Board) cross-appeal from the trial court's judgment awarding Mr. Holmes damages under the Missouri Human Rights Act (MHRA) and on breach of contract and whistleblower claims. We affirm in part, reverse in part, and remand the determination of reasonable attorney fees to the trial court.

### Factual and Procedural Background[1]

In January 2003, a KCPD homicide detective, Michael Hutcheson, requested that Officer Holmes and Officer Shawn Hamre assist in a missing persons search for a man named Guy Coombs. While investigating, Officer Holmes was reporting to Detective Hutcheson by cell phone. The officers were directed to an apartment in midtown Kansas City. Based on the lead, Detective Hutcheson instructed the officers to do a "knock-and-talk" and show Mr. Coombs's photo to the apartment's occupants. At trial, a former narcotics detective testified that one of the apartment's occupants, Mr. Edward Henderson, was the target of an undercover drug investigation.

Officers Holmes and Hamre knocked on the apartment door and told Mr. Henderson they were attempting to locate Mr. Coombs and wanted to show him a photo. Mr. Henderson opened the door, and they walked into the apartment. Offi-

---

1. We view the evidence in the light most favorable to the jury's verdict, and give the prevailing party all reasonable inferences from the verdict while disregarding the unfavorable evidence and its inferences. *Williams v. Trans States Airlines, Inc.,* 281 S.W.3d 854, 866 (Mo.App. E.D.2009).

cer Holmes saw another man sitting on the apartment floor with a gun beside him. He yelled, "Gun!", drew his weapon, and instructed the man to move away from the weapon. The officers handcuffed the two men and patted them down. Officer Holmes put the gun into the freezer to secure it. They conducted an identity check through dispatch and showed the men Mr. Coombs's photo, asking where and when they had seen him. Officer Holmes called Detective Hutcheson who told him, "Don't recover anything. Don't effect an arrest. Just leave everything. Come down here, write it up, and we'll take it over from there."[2] The officers took the men outside the apartment, uncuffed them, and asked them to wait until the officers had left the building before they re-entered the apartment. As the officers were leaving the apartment, Officer Holmes saw a box of shells on the floor. He asked the men if the shells belonged to either of them; after they said no, he said, "Well, I'll just hold on to them," and took them with him.

The officers called their field sergeant and met with him to review the action and the instructions they had been given by Detective Hutcheson. They were told to "do what homicide [told them] to do." Officer Holmes subsequently wrote a report as a supplement to the missing persons report; it was approved by the desk sergeant, and faxed to Detective Hutcheson's attention by Officer Holmes. The report did not mention that the officers had been in Mr. Henderson's apartment.

Mr. Coombs's body was discovered shortly thereafter, and Mr. Henderson was charged with his murder.

Almost three years later, Officer Holmes was contacted by a prosecutor handling Mr. Coombs's murder case. He told the prosecutor about the events of that evening; she accused him of lying. She testified that nothing in the police reports she had been given indicated that Officer Holmes had been in Mr. Henderson's apartment. Officer Holmes testified that he remembered the gun shells, went to his patrol car to retrieve them, and then showed them to her. After the prosecutor complained to KCPD, an Internal Affairs investigation was conducted. In August 2006, Mr. Holmes was placed on suspension without pay. Seventeen months later, the Board terminated him.

Mr. Holmes filed a charge of discrimination with the Missouri Commission on Human Rights and was issued a right to sue letter. He filed suit against the Board in a four-count petition seeking damages under the MHRA, for whistleblowing, and for breach of contract. His first count alleged that he was African–American and that the Board violated the MHRA because his race was a contributing factor in the Board's decision to suspend and terminate him. Mr. Holmes's second and third counts alleged that he was terminated for reporting the misconduct of detectives to the prosecuting attorney and the KCPD. Finally, his fourth count alleged that the Board breached his employment contract by terminating him without cause.

At a trial beginning on March 30, 2010, the Board contended that Mr. Holmes had been fired solely for cause, for job performance, and that race was not a part of its determination. Although during the Internal Affairs investigation Detective Hutcheson stated that he remembered talking to Mr. Holmes ten to fifteen times

**2.** Testimony at trial explained that "recovery" meant to take items to the property room and file a corresponding report.

on the night in question, he denied that he had been working at trial.

The jury heard that Officer Hamre, who was Caucasian, was recommended for five days suspension. Detective Hutcheson, who was also Caucasian, was recommended for eight days suspension; a Grievance Committee within the police department subsequently exonerated him. The jury also heard stipulations as to instances in which other KCPD officers had been cited for a failure to write reports, recover evidence, causing a murder trial to be dismissed, entering a home without permission—and that those actions had not been deemed cause for termination. It also heard evidence that Mr. Holmes had multiple commendations, his demeanor record was unmarred, and he had gone multiple years without taking a sick day. Mr. Holmes testified that he was the only minority investigated and that he believed race was the reason he "got the blunt of the punishment."

The jury found for Mr. Holmes on the claim for race discrimination and awarded him $250,000 actual damages and $250,000 in punitive damages. The jury agreed with the "Whistleblowing" claim and awarded him $3,500,000. The jury further found a breach of contract and assessed an additional $2,500,000 in damages. The trial court entered judgment for the sum of the jury's damages awards and assessed costs against the Board.

After trial, Mr. Holmes moved for an award of attorney fees, as well as for negative employment information to be expunged from his personnel record. He subsequently also moved for post-verdict attorney fees. The Board moved for judgment notwithstanding the verdict (JNOV), or in the alternative for new trial or remittitur. The trial court granted Mr. Holmes's motions in part by awarding part of the requested attorney fees and denied

his request to expunge the information from his personnel record; it further denied the Board's post-trial motion. Mr. Holmes and the Board both appeal.

## Legal Analysis

The Board raises six points on appeal arguing that the trial court erred in denying its motions for directed verdict and JNOV on each of Mr. Holmes's claims, in submitting punitive damages to the jury, and in refusing to merge or remit the compensatory damages awarded by the jury. Mr. Holmes raises one point challenging the award of attorney fees and requests attorney fees on appeal. We first address the Board's appeal.

### Breach of Contract

In points one and two, the Board contends the trial court erred in denying its motions for directed verdict and for JNOV on Mr. Holmes's breach of contract claim. We review the trial court's denial of a motion for directed verdict and denial of a motion for JNOV under the same standard. *Kline v. City of Kansas City,* 334 S.W.3d 632, 649 (Mo.App. W.D.2011). We must determine whether the plaintiff made a submissible case by offering legal and substantial evidence on each fact essential to liability. *Williams v. Trans States Airlines, Inc.,* 281 S.W.3d 854, 865–66 (Mo.App. E.D.2009). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Id.* at 866 (internal quotation marks and citation omitted). We view the evidence in the light most favorable to the jury's verdict, disregarding unfavorable evidence and drawing all reasonable inferences in favor of the prevailing party. *Id.*

In point one, the Board argues that it had no employment contract with Mr. Holmes providing that he could only be

terminated for cause. While it acknowledges that section 84.600 provides that non-probationary officers may be terminated only for cause, it contends the statute cannot serve as the basis for a breach of contract action.[3]

■ An action for breach of contract requires the plaintiff to demonstrate: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010). A valid contract contains the essential elements of "offer, acceptance, and bargained for consideration." *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. banc 1988). "The existence of a contract necessitates a 'meeting of the minds' which the court determines by looking to the intention of the parties as expressed or manifested in their words or acts." *J.H. v. Brown*, 331 S.W.3d 692, 701–02 (Mo.App. W.D.2011).

■ An employer in Missouri may generally terminate an employee for cause or without cause, absent a contrary contractual or statutory provision. *Doran v. Chand*, 284 S.W.3d 659, 664–65 (Mo.App. W.D.2009). In section 84.600, the legislature granted a Kansas City police officer who has served his probationary period the right to be terminated only for cause. *See Pfefer v. Bd. of Police Comm'rs*, 654 S.W.2d 124, 127 (Mo.App. W.D.1983). "Termination for cause distinguishes certain types of employment from at will employment, which is presumed in most employee/employer relationships." *Spencer v. Zobrist*, 323 S.W.3d 391, 397 n. 6 (Mo. App. W.D.2010) "Cause" means "legal cause" and is defined as a reason "which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public." *Id.* at 397 (internal quotation marks and citation omitted).

■ The section states that after serving six months, the officer shall be appointed to the police force and "thereafter be subject to discharge or removal only for cause and upon complaint being made or charges being preferred against them."

**3.** The parties devote much of their briefs disputing whether the Board adequately preserved its argument as to the submissibility of Mr. Holmes's breach of contract claim. Mr. Holmes argues that the Board admitted the contract pursuant to Rule 55.09 because it did not deny Paragraph 38 of his Third Amended Petition, which asserted that Mr. Holmes "had a valid employment contract and business expectancy in continued employment," and that the Board failed to object to the verdict director on the breach of contract claim at trial. However, as argued by the Board, its answer denied that it breached a contract with Holmes by terminating him without cause, which is the operative issue. Its answer also denied every other paragraph of the breach of contract claim excepting Paragraph 38, and its denial of "Paragraphs 1–37" rather than "Paragraphs 1–38" was an obvious mistake. Further, as Mr. Holmes concedes, the Board argued in its motion for summary judgment that Mr. Holmes did not have an employment contract with the Board. In both of its motions for directed verdict, the Board likewise argued Mr. Holmes did not have a contract with the Board, that if agreeing to work for pay created a contract, then every employee was a contract employee, and that the Board's legal obligation under section 84.600 could not provide consideration. Finally, its motion for JNOV asserted that Mr. Holmes's "contract claim fail[ed] as a matter of law because section 84.600 does not describe the terms of a contract." Under these circumstances, we do not find the underlying record to demonstrate waiver. *See Duerbusch v. Karas*, 267 S.W.3d 700, 707 (Mo.App. E.D.2008).

§ 84.600.[4] It gives an officer a right to a public hearing before the Board, where the officer may be confronted by the witnesses against her and be defended by counsel. *Id.* After the hearing, the Board votes on whether the charges were sustained and, if so, to determine the officer's punishment. *Id.* Consequently, the statute gives the officer a property right in continued employment and the "emoluments" of the office. *Belton v. Bd. of Police Comm'rs of Kansas City,* 708 S.W.2d 131, 137 (Mo. banc 1986). The property right entitles the officer to due process before termination. *Id.* However, we do not agree with Mr. Holmes that the statute provides an officer with a contractual right to sue for damages for wrongful termination.

A statute expresses the public policy of the state. *See Egan v. St. Anthony's Med. Ctr.,* 244 S.W.3d 169, 173 (Mo. banc 2008). Our role in interpreting a statute is to determine the legislature's intent "from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning." *State ex rel. Rogers v. Bd. of Police Comm'rs of Kansas City,* 995 S.W.2d 1, 3 (Mo.App. W.D.1999) (internal quotation marks and citation omitted).

"[T]he general rule is that there is no private right of action to enforce a statute or regulation" through an action for damages. *Egan,* 244 S.W.3d at 173. We find nothing in section 84.600's plain language suggesting that the legislature intended to supersede this general rule and grant officers a right to sue the Board for common law breach of contract. In fact, such an interpretation is contrary to the statute's provision of a specific procedure for review of the Board's termination decision. Where administrative review of a denied property right is adequate, parties may not "forego

that remedy in favor of a contract action." *Byrd v. Bd. of Curators of Lincoln Univ. of Mo.,* 863 S.W.2d 873, 876 (Mo. banc 1993). This is distinguishable from a claim such as that in the MHRA "designed to recompense plaintiffs for a personal loss they have sustained because of improper treatment of them as human beings." *See James v. City of Jennings,* 735 S.W.2d 188, 190 (Mo.App. E.D.1987).

Nor do we find that the statute creates a contractual term binding the Board and the officer. The Board is a creature of statute, and the scope of its authority is defined by statute. *Vivona v. Zobrist,* 290 S.W.3d 167, 173 (Mo.App. W.D.2009). The Board's duty to comply with the statute is a preexisting legal duty imposed on it by the legislature; the legislature may freely amend the statute, the "for cause" provision is not an offer from the Board, and it cannot furnish consideration for the officer's service. *See Doran,* 284 S.W.3d at 665. Missouri case law is clear that a hospital's legal obligation by state regulation to abide by its bylaws cannot furnish the consideration for a contract with its doctors. *Egan,* 244 S.W.3d at 174. Likewise, an employer's unilateral act in publishing a handbook does not create a contractual right in its employees. *Doran,* 284 S.W.3d at 664. We see no basis to find a contractual term in a statute enacted by the legislature to govern the Board's disciplinary procedures.

The Board's first point is granted and the judgment awarding Mr. Holmes damages for breach of contract is reversed.

In point two, the Board argues the trial court erred in denying its post-trial motions in regards to Mr. Holmes's breach of contract claim because Mr. Holmes was bound to seek redress through the Missouri Administrative Procedures Act by

4. Statutory references are to RSMo 2000.

filing a petition for judicial review of the Board's termination decision. Because we have reversed that portion of the judgment awarding contract damages, the Board's second point is moot and denied.

## Whistleblower Claim

In point three, the Board contends the trial court erred in denying its motions for directed verdict and JNOV on Mr. Holmes's whistleblower claim because it sounded in tort and was therefore barred by sovereign immunity. Mr. Holmes argues that the whistleblower claim arose in contract, not tort.

In a submissible whistleblower claim, the plaintiff "establishes that the plaintiff reported a violation of law or 'well-established and clearly mandated public policy' to his supervisors or to legal authorities, that the employer then discharged him, and that there is a direct causal connection between the protected activity (the whistleblowing) and the discharge." *Bennartz v. City of Columbia*, 300 S.W.3d 251, 257 (Mo.App. W.D.2009). It offers a cause of action for wrongful discharge, which is an exception to the employment at-will doctrine. *See Clark v. Beverly Enters.–Mo., Inc.*, 872 S.W.2d 522, 525 (Mo.App. W.D.1994). Although prior cases had barred contract employees from asserting a cause of action for the tort of wrongful discharge, recently our Supreme Court also extended the claim's availability to contract as well as at-will employees. *Keveney*, 304 S.W.3d at 102–03.

Under section 537.700, however, public entities are protected from suit in tort by sovereign immunity (with a few limited exceptions inapplicable here). *See Gregg v. City of Kansas City*, 272 S.W.3d 353, 358 (Mo.App. W.D.2008). The Board is a legal subdivision of the state and, as such, is protected by sovereign immunity in its operation and maintenance of a police force, as long as the immunity has not been waived by statute. *Gregg*, 272 S.W.3d at 358, 362. This immunity extends to protect the entity against suits for wrongful discharge by former employees, unless some exception applies. *Brooks v. City of Sugar Creek*, 340 S.W.3d 201, 205 – 206 (Mo.App. W.D.2011).

However, "[s]overeign immunity does not apply to suits for breach of contract." *Kunzie v. City of Olivette*, 184 S.W.3d 570, 575 (Mo. banc 2006); *see also Edoho v. Bd. of Curators of Lincoln Univ.*, 344 S.W.3d 794, 799 (Mo.App. W.D.2011) (finding error in dismissing contract claim on basis of sovereign immunity). In *Kunzie*, the plaintiff employee alleged the city's wrongful discharge deprived him of retirement benefits and breached a contractual right. 184 S.W.3d at 574. Although the employee's tort claims were remanded to determine if an exception to sovereign immunity applied, the Missouri Supreme Court found sovereign immunity did not bar the breach of contract claim. *Id.* at 575. Thus, Mr. Holmes argues that his whistleblower claim was not barred by sovereign immunity because it sounded in contract rather than tort.

As noted, a claim for breach of contract requires: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney*, 304 S.W.3d at 104.

In the second count of his third amended petition, Mr. Holmes alleged "Whistleblowing (Reporting Illegal Conduct)." He contended that he was an employee, that he had reported detectives' violations of the law to the prosecuting attorney, that the Board fired him in retaliation for reporting, and that he sustained damages. In the third count, also for whistleblowing, he similarly alleged that he was an employee, that his truthful answers

to judicial officers complied with public policy, that the Board fired him in retaliation for these actions, and that he sustained damages. There is no mention of a contract or contractual terms. We simply cannot find in these whistleblower allegations that Mr. Holmes alleged a claim in contract.

█ In his fourth count "Breach of Employment Contract," Mr. Holmes alleged that he had an employment contract that provided he could only be terminated for cause, that the Board breached the contract by, *inter alia*, firing him for reporting the misconduct of others, and that he thereby sustained damages. Because Mr. Holmes's fourth count contains the elements of breach of contract based on his allegedly protected reporting, it could be construed as pleading a whistleblower claim sounding in contract. Thus, we do not agree with the Board that the "petition never alleges that his termination for supposedly reporting wrongful conduct amounted to a breach of contract." In fact, the Board cites to the second amended petition rather than the third amended petition on which the case was tried.

However, although the petition may be construed to have pleaded a whistleblower claim sounding in contract, the claim was not so submitted to the jury. At the close of trial, the jury was given three separate verdict directors: one for Mr. Holmes's race discrimination claim, one for his whistleblower claim, and one for his breach of contract claim. The whistleblower instruction contained the elements of employment, reporting, employment termination, a causal connection between the latter two, and damages. The jury was told its verdict must be for Mr. Holmes on his "Whistleblower" claim if:

> First, plaintiff was employed by the defendant; and
>
> Second, plaintiff [had] reported to the Internal Affairs investigation information that revealed that other police officers had given false and material statements which were used in an affidavit to obtain a search warrant; and
>
> Third, defendant thereafter terminated plaintiff from his employment, and
>
> Fourth, plaintiff's reporting of the information referenced in paragraph second above was a contributing factor in the decision to terminate plaintiff from his employment; and
>
> Fifth, as a direct result of such termination, plaintiff sustained damages.

As noted, the jury awarded Mr. Holmes a separate $3,500,000 on this claim, in addition to his claim for breach of contract.

In light of the whistleblowing instruction, we cannot find it was submitted as a claim in contract rather than a claim in common-law tort. The elements in the verdict director closely mirror the wrongful discharge instruction now in effect, and are not patterned after the breach of contract series of instructions in effect at the time this case was tried. *See* MAI 31.27 (6th ed. Supp.2011) (effective July 1, 2011); MAI 26.00 (6th ed.). Consequently, although the petition may be construed to have pleaded a contractual whistleblowing claim, the whistleblowing claim was submitted to the jury as a tort. As such, the jury's verdict and award were barred by the Board's sovereign immunity unless an exception applied.

The trial court's conclusion that sovereign immunity did not bar the whistleblower claim was based on the purpose of the cause of action: "[t]he intent of the whistleblower doctrine is to encourage employees to report misconduct without fear of retaliation or adverse action.... It is difficult to imagine or identify a department or agency where the protections of the whistleblower doctrine should be more faithfully followed." Mr. Holmes similarly argues that "[a]s a matter of public policy this

Court should consider that where a police officer statutorily protected from discharge for cause ... alerts judicial officers [to misconduct], that conduct goes directly to the preservation of the integrity of the judicial system."

While we are cognizant of these policy arguments, we are constrained by the law. In *Bennartz,* although there was evidence of reprehensible conduct towards the whistleblowing employee, we were bound by sovereign immunity. 300 S.W.3d at 262. We noted competing policy concerns and deferred to the apparent legislative determination in favor of "the public purse" by its choice to protect "cities from bearing the cost of defending suits under the common law." *Id.* at 262; *see also id.* at 264 (Pfeiffer, J., concurring but urging the Missouri Supreme Court to review intentional misconduct by municipal supervisory employees and its impact on immunity). In *Brooks,* we specifically found that sovereign immunity protected a city and its employees from tortious claims of wrongful discharge by a police officer. 340 S.W.3d at 207. Although we agreed with Officer Brooks that "a strong policy argument can be made for a different outcome when exceptional circumstances are alleged," and reiterated the concerns expressed in *Bennartz*'s concurrence, we rejected the officer's argument as barred by the current state of Missouri law. *Id.* at 207–08.

Mr. Holmes attempts to distinguish *Bennartz* and *Brooks* by arguing that these cases did not involve section 84.600's requirement that KCPD officers may only be terminated for cause. While the statute expresses the legislative intent that KCPD officers may only be terminated for

cause and provides for public hearing procedures before the Board, we do not equate this with an intent to abrogate sovereign immunity and open the Board to private suit for wrongful discharge.

As a result, Mr. Holmes' whistleblowing award was barred by the Board's sovereign immunity. Consequently, the Board's third point is granted and the judgment awarding Mr. Holmes damages for whistleblowing is reversed.

### MHRA Claim

In points four and five, the Board raises arguments concerning Mr. Holmes's MHRA claim. The Board first argues Mr. Holmes failed to make a submissible case for discrimination. As noted, to make a submissible case, the plaintiff "must demonstrate that each and every fact essential to liability is predicated upon legal and substantial evidence." *Williams,* 281 S.W.3d at 865. The Board contends that Mr. Holmes failed to make a submissible case because he failed to show that the Board "treated any similarly-situated police department employees any differently," including Officer Hamre and Detective Hutcheson. It further argues that "similarly-situated" requires discipline by the same supervisor and that Officer Hamre and Detective Hutcheson were disciplined by the Chief, while Mr. Holmes was terminated by the Board.[5] We reject the Board's arguments.

First, the Board relies on a federal standard and, thus, misstates the proof required. The MHRA prohibits discriminatory employment practices and defines discrimination as "any unfair treatment based on race, color, religion, national origin, ancestry, sex, age as it relates to

---

**5.** As part of its argument, the Board contends that Officer Hamre had only been on the force for seven months at the time of the events. We note that the Board misstates the record. Officer Hamre testified he had been on the

force for six years, as had Mr. Holmes; the portion of the transcript cited by the Board states that Mr. Holmes and Officer Hamre *had been partners* for seven months.

employment, disability, or familial status as it relates to housing." *Claus v. Intrigue Hotels, LLC*, 328 S.W.3d 777, 781–82 (Mo.App. W.D.2010) (internal quotation marks and citation omitted). To make a submissible case under the MHRA, Mr. Holmes was not required to show, as the Board argues, that the Board treated "similarly-situated police department employees ... differently." Rather, the MHRA required him to show that a protected characteristic contributed to the adverse employment decision. *Id.* at 782.

In *Daugherty v. City of Maryland Heights*, the Missouri Supreme Court made clear that while we may be guided by federal discrimination case law where it is consistent with Missouri law, our standards are not identical, and the MHRA can offer greater protection against discrimination than federal law. 231 S.W.3d 814, 819 (Mo banc.2007). Under the MHRA, discrimination is "*any* unfair treatment" based on a protected characteristic. *See* § 213.010(5) (emphasis added). Relying on this broad language, *Daugherty* held that MHRA claims were properly analyzed to determine whether a discriminatory reason was a "contributing factor." 231 S.W.3d at 820; *see also McCullough v. Commerce Bank*, 349 S.W.3d 389, 398 (Mo.App. W.D.2011) (dis-

cussing and applying *Daugherty*). A "contributing factor" is a factor that "contributed a share in anything or has a part in producing the effect." *Williams*, 281 S.W.3d at 867 (internal quotation marks and citation omitted).

Consequently, MAI 31.24 directs the jury to find for the plaintiff if it believes race was a "contributing factor" in an allegedly discriminatory act. Here, the jury was properly instructed in accord with MAI 31.24 to find for Mr. Holmes if Mr. Holmes's race was a "contributing factor" in the termination. Through evidence of the disparate discipline afforded to white officers for similar acts, Mr. Holmes set forth legal and substantial evidence on the facts essential to liability, "hav[ing] probative force upon the issues, and from which the trier of fact [could] reasonably decide the case." *See id.* at 866.[6]

Second, we reject the Board's contention that it could not be held responsible for a MHRA violation because it was the Chief who made disciplinary decisions concerning other officers, including Officer Hamre and Detective Hutcheson, while it was the Board who terminated Mr. Holmes.[7] The MHRA defines "employer" to include "any person directly acting in the interest of an employer." § 213.010.

---

6. While the Board further attempts to argue that "similarly situated" is a standard distinct from "contributing factor" and consequently remains a standard in effect, we find its argument without support. It relies on a statement in *Ruppel v. City of Valley Park*, 318 S.W.3d 179, 185 (Mo.App. E.D.2010), in which the court quoted that an element of the employee's *prima facie* case for workplace discrimination is that "(4) she was treated differently from similarly situated males." However, the Board ignores the court's next sentence: "The fourth element of a *prima facie* discrimination case also can be met if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination.'" *Id.* (internal quotation marks and citation omitted). Moreover, the

Board ignores the analysis actually used by the court, which was to determine whether in accord with MAI 31.24 the employee had shown gender was a "contributing factor" in her termination. *Id.* at 184.

7. The Chief has the statutory power to "promote, discipline and suspend all police officers and policemen." § 84.500(1). "A report of all such actions taken (other than suspensions of less than fifteen days)" is required to be given to the Board. *Id.* The Board retains final authority to review the Chief's decisions that are required to be reported; it may "affirm, modify, or reverse such action of the chief and ... make such other orders as the board may deem necessary." § 84.610.

Moreover, the Chief is the Board's agent, serving at the Board's "pleasure." § 84.490. Further, under the MHRA, knowledge of a supervisor's conduct may be imputed to the employer. *See Claus,* 328 S.W.3d at 783–84 n. 3; *see also Brady v. Curators of Univ. of Mo.,* 213 S.W.3d 101, 112 (Mo.App. E.D.2006). In contravention of the statute's plain language, the Board's argument would permit employers to escape liability for discrimination against employees by delegating decision-making to their supervisory employees. We do not believe that in developing evidence of discrimination through disparate treatment, Mr. Holmes's case was required to draw a distinction between the actions of the Chief and the actions of the Board. The Board's fourth point is denied.

In the fifth point, the Board contends the trial court erred in submitting punitive damages to the jury because Mr. Holmes failed to introduce substantial evidence of the Board's reckless or outrageous conduct.

■■ Section 213.111 authorizes the trial court to award punitive damages in an action under the MHRA. Punitive damages are authorized because "often in discrimination cases, the actual monetary harm to the employee is minimal, but discrimination is so insidious in society that the legislature has found it necessary to allow the assessment of punitive awards to punish the wrongdoing and deter future discriminatory conduct." *Hervey v. Mo. Dep't of Corr.,* No. WD 72899, 2011 WL 4025395, at *7 (Mo.App. W.D. Sept.13, 2011), *transfer granted.*

■■ For punitive damages to be submitted to the jury, the evidence and its reasonable inferences must allow a reasonable juror to conclude that it was highly probable that the defendant acted with "evil motive or reckless indifference." *Howard v. City of Kansas City,* 332 S.W.3d 772, 788 (Mo. banc 2011). Wheth-

er there was sufficient evidence for the award is a question of law. *Brady,* 213 S.W.3d at 109. We review the evidence and its reasonable inferences in the light most favorable to the award. *Id.* We further disregard all adverse inferences. *Williams,* 281 S.W.3d at 870.

The Board acknowledges that "[p]unitive damage awards have been sustained when the Court found that (1) management participated in the discriminatory conduct, and (2) treated the Plaintiff differently from others." *Brady,* 213 S.W.3d at 107. However, it argues that punitive damages are not justified because Mr. Holmes failed to prove the Board acted "intentionally." It compares the instant case to *Howard,* in which there was direct evidence of the City Council's statements in public meetings that it was refusing to consider a judicial panel because of the panelists' race.

■■ The Board seems to equate the facts of *Howard* with a requirement that there must be direct evidence of intentional misconduct to submit punitive damages. There is no such rule in Missouri. Punitive damages may be awarded on a showing that the defendant intentionally and knowingly committed a wrongful act "without just cause or excuse." *Williams,* 281 S.W.3d at 870. However, direct evidence of intentional conduct is not required: punitive damages awards are evaluated on a case-by-case basis and "[a]n evil intent may ... be implied from reckless disregard of another's rights and interests." *See Claus,* 328 S.W.3d at 783, 785.

■■ The Board further misunderstands the plaintiff's burden under the MHRA. Most employment discrimination cases are "inherently fact-based" and necessarily rely on inferences rather than direct evidence. *Williams,* 281 S.W.3d at 867. "Direct evidence is not common in discrimination cases because employers are shrewd enough to not leave a trail of direct evidence." *Daugherty,* 231 S.W.3d

at 818 n. 4. In the absence of direct evidence, a plaintiff may use circumstantial evidence to prove her case. *Williams,* 281 S.W.3d at 867.

■ As the Board concedes, the evidence supporting the employee's substantive claim and her claim for punitive damages "need not be mutually exclusive, and often is not." *Claus,* 328 S.W.3d at 783. The employee's evidence in support of her MHRA claim may also meet her burden for submitting punitive damages to the jury. *Id.* As there is no bar to proof of the employer's liability also providing the basis for punitive damages, it follows that the plaintiff may also show the discriminatory conduct supporting punitive damages by circumstantial evidence. *See Williams,* 281 S.W.3d at 870. The rationale for allowing the jury to make reasonable inferences in determining liability for punitive damages is the same as that for the substantive claim: employers may act to prevent the development of direct evidence and a clear evidentiary trail of discriminatory intent is rare.[8] *See also Brady,* 213 S.W.3d at 110 (an employer's use of trickery and deceit to disguise discriminatory conduct may justify punitive damages). Consequently, we reject the Board's argument that Mr. Holmes failed to make a submissible case for punitive damages because he did not provide direct evidence that the Board acted intentionally.

■ As in its fourth point, the Board again contends that it cannot be held liable for disparate treatment because although it disciplined Mr. Holmes, it "had nothing to do with the disciplinary decisions that were made regarding either [Officer] Hamre or Detective Hutcheson." Again,

we reject this argument on a principle of agency and the MHRA's explicit definition of employer. *See* § 213.010(7). Nor will we impose the additional burden suggested by the Board; there is no requirement that the plaintiff must show the supervisor and the employer were "acting in concert." Finally, we also reject the Board's contention that it did not consider race during the investigation because two of the "participants in the alleged discrimination"—KCPD's Deputy Chief and a Board member—were themselves African–American, and the jury was thus not entitled to consider whether there was evidence of evil motive. To submit a case for punitive damages against an entity, a plaintiff does not have to prove that every member of the entity acted with reckless disregard or evil motive. Nor does a participant's race provide a magic shield against allegations of discrimination. Mr. Holmes presented his evidence, and "[t]he jury is the sole judge of the credibility of witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony." *Keveney,* 304 S.W.3d at 105. The Board's fifth point is denied.

*Failure to Merge or Remit Damages*

Finally, in point six, the Board argues the trial court erred in refusing to "merge the verdicts to correct the duplicative damages" or to remit the damages because the awards overlap and Mr. Holmes did not argue he suffered a separate injury for each claim. Because we have reversed the trial court's judgment awarding damages for Mr. Holmes's breach of contract and whistleblower claims, this point is rendered moot. The Board's sixth point is consequently denied.[9]

---

8. It is the rare case where the defendants openly announce an intention to discriminate. *Howard* is the exception that proves the rule. To require such evidence would eviscerate the legislature's intent to ferret out insidious discrimination and to discourage such conduct, not only by the defendant, but by others by awarding punitive damages.

9. We recognize that an argument could be made that, due to the interrelationship between Mr. Holmes's contract, whistleblower,

## Attorney Fees Award

We now turn to Mr. Holmes's appeal. In his sole point, Mr. Holmes disputes the trial court's award of attorney fees. Mr. Holmes argues that he requested attorney fees in the amount of $422,131.25, and costs in the amount of $12,675.60 pursuant to section 213.111.2 of the MHRA. The trial court reasoned that because only the MHRA authorized attorney fees and Mr. Holmes's claims were "inextricably intertwined" with the other claims, Mr. Holmes was only entitled to $155,000, approximately one-third of the request when including Mr. Holmes's supplemental motion for post-verdict attorney's fees.

▆▆▆▆▆ Generally, Missouri follows the American Rule, which requires litigants to bear their own attorney fees unless otherwise authorized by statute. *See Williams v. Fin. Plaza, Inc.*, 78 S.W.3d 175, 184 (Mo.App. W.D.2002). The MHRA specifically authorizes attorney fees for plaintiffs prevailing in discrimination suits, including subdivisions of the state. *See Howard*, 332 S.W.3d at 788. The reasons are twofold: (1) to fully make the plaintiff "whole" by compensating her for the costs of bringing suit, and (2) to deflect that discrimination suits may result in nominal or small monetary damages. *Hervey*, 2011 WL 4025395 at *7. "The act recognizes the public purpose served by litigation that vindicates the rights of those who are discriminated against." *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 523 (Mo. banc 2009).

▆▆▆▆▆ The applicable rules concerning attorney fees on multiple claims are stated in *Alhalabi v. Missouri Department of Natural Resources*:

If the plaintiff's claims for relief are based on different legal theories and facts and counsel's work on one claim is unrelated to his work on another claim, the unrelated claims must be treated as if they had been raised in separate lawsuits, and, therefore, no fee may be awarded for services on the unsuccessful and unrelated claims.... On the other hand, if the claims for relief have a common core of facts and are based on related legal theories and much of counsel's time is devoted generally to the litigation as a whole making it difficult to divide the hours expended on a claim-by-claim basis, such a lawsuit cannot be viewed as a series of distinct claims. Instead, where a plaintiff's claims are related and he has obtained excellent results overall, his counsel should recover a fully compensatory fee....

300 S.W.3d 518, 530–31 (Mo.App. E.D. 2009) (internal citations omitted). The trial court appears to have reversed this standard. It determined that the claims "were so intertwined that Plaintiff's attorneys necessarily would have worked on the Whistleblower and/or Breach of Contract claims while simultaneously working on the MHRA claim" and used that as a reason to deny approximately two-thirds of the attorney fees request. Yet our case law directs that if the claims are so intertwined, with the legal work overlapping by the claims' shared legal theory and facts, then the attorney fees awarded should reflect the work expended on all the claims. *Id.* Consequently, we remand to the trial court to apply the appropriate standard in awarding attorney fees.

and MHRA claims, reversal of the judgment as to the contract and whistleblower claims could warrant a remand for retrial of the MHRA claim, or a retrial limited to damages on that claim. Mr. Holmes has made no such argument, however. In fact, in responding to the Board's argument that the damage awards on those claims should be merged, Mr. Holmes emphasized that he had a separate injury under each claimed wrong.

In light of our reversal of the judgment for breach of contract and whistleblowing, the trial court may also consider the "overall relief obtained" by Mr. Holmes in determining an appropriate fee. *Trout v. State*, 269 S.W.3d 484, 488 (Mo.App. W.D. 2008). Mr. Holmes' sole point is granted, and the trial court's judgment awarding attorney fees is reversed and remanded.

### *Attorney Fees on Appeal*

We now turn to Mr. Holmes's motion for attorney fees on appeal. Section 213.111.2 authorizes the court to "reasonable attorney fees to the prevailing party." "A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing suit." *Alhalabi*, 300 S.W.3d at 530. Because the Board's liability for Mr. Holmes's MHRA claim and punitive damages was affirmed on appeal, Mr. Holmes may be viewed as the prevailing party. *See Mitchell v. Res. Funding Corp.*, 334 S.W.3d 477, 514 (Mo.App. W.D. 2010). In our discretion, we grant Mr. Holmes request for reasonable attorney fees and remand to the trial court for appropriate determination.

### Conclusion

The Board's first and third points are granted and its other points are denied. Mr. Holmes's sole point and request for attorney fees on appeal are granted and remanded to the trial court for determination.

AHUJA, P.J., and WELSH, J. concur.