

# In the Missouri Court of Appeals
# Eastern District

### DIVISION TWO

| | | |
|---|---|---|
| SHERRY YIHUI WENG, | ) | ED101420 |
| | ) | |
| Plaintiff/Appellant, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | |
| | ) | |
| WASHINGTON UNIVERSITY, | ) | Honorable David L. Dowd |
| | ) | |
| Defendant/Respondent. | ) | Filed: April 28, 2015 |

### Introduction

Sherry Yihui Weng (Appellant) appeals from the trial court's summary judgment entered in favor of Washington University (Respondent) on her five-count petition. We affirm.

### Factual and Procedural Background

From January 3, 2010 to January 31, 2012, Appellant was employed by Respondent in its School of Medicine, Department of Anesthesiology, as a research biologist in the laboratory of Dr. Zhou-Feng Chen (Dr. Chen). After the cessation of her employment, Appellant filed a five-count petition against Respondent alleging in various ways that she had worked overtime without time-and-a-half pay as required by law and she was wrongfully discharged for blowing the whistle on Dr. Chen's actions violating public policy and the law. Respondent filed a motion for summary judgment, which the trial court granted. This appeal follows. Additional facts will be adduced as necessary in the discussion of the points on appeal.

<u>Points on Appeal</u>

In her first point, Appellant claims the trial court erred in granting summary judgment to Respondent on Count I of her petition for unpaid overtime pursuant to Missouri's Minimum Wage Law, Sections 290.500 et seq.,[1] because Appellant was not an exempt employee under the learned professional exemption in that Respondent's classification of her as exempt is irrelevant, and unresolved material issues of fact remain as to whether Appellant exercised independent discretion and judgment in her work.

In her second point, Appellant asserts the trial court erred in granting summary judgment to Respondent on Count II of her petition for wrongful discharge because it erroneously determined Appellant cannot show a causal connection between her whistleblowing and the ending of her employment, in that she was terminated immediately after her boss learned of her complaint.

In her third point, Appellant maintains the trial court erred in granting summary judgment to Respondent on Count II of her petition for wrongful discharge because it erred in finding Appellant cannot prove damages, in that she lost at least 22 days of income and may recover nominal damages and for emotional distress.

In her fourth point, Appellant contends the trial court erred in granting summary judgment to Respondent on Count II of her petition for wrongful discharge because it erred in finding that the statutes and regulations Appellant references in her petition do not establish a clearly mandated public policy, in that she reported four separate violations of clearly mandated public policy: violations of federal grant guidelines, research misconduct, violations of immigration law, and wage and hour violations.

---

[1] All statutory references are to RSMo 2006, unless otherwise indicated.

In her fifth point, Appellant states the trial court erred in granting summary judgment to Respondent on Counts III, IV, and V of her petition asserting claims, respectively, for unpaid wages under Section 290.110,[2] quantum meruit, and unjust enrichment because Respondent owes Appellant unpaid overtime, unpaid wages, and vacation pay.

## Standard of Review

Appellate review of the grant of summary judgment is *de novo*. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo.banc 1993). Summary judgment will be upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. Id. at 377. The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. Id. at 376. Facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. Id.

A defending party may establish a right to judgment as a matter of law by showing any one of the following: (1) facts that negate any one of the elements of the claimant's cause of action, (2) the non-movant, after an adequate period of discovery, has not and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the

---

[2] Section 290.110, titled "Payment due discharged employee-exceptions-penalty for delay," provides in pertinent part as follows:

> Whenever any person, firm or corporation doing business in this state shall discharge any … employee thereof, the unpaid wages of the … employee then earned … shall be and become due and payable on the day of the discharge …. as a penalty for such nonpayment the wages of the … employee shall continue from the date of the discharge…at the same rate until paid; provided, such wages shall not continue more than sixty days….

claimant's elements, or (3) there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense.  Id. at 381.

Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed.  Id.  The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial.  Id.

Discussion

Point I

Appellant claims Respondent owes her overtime pay because she was not an exempt employee under the learned professional exemption to the minimum wage laws.

Missouri's minimum wage law states that "[n]o employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  Section 290.505.1.  The law goes on to state "the overtime requirements of subsection (1) shall not apply to employees who are exempt from federal minimum wage or overtime requirements including, but not limited to, the exemptions or hour calculation formulas specified in 29 U.S.C. Sections 207 and 213, and any regulations promulgated thereunder."  Section 290.505.3.

The Fair Labor Standards Act (FLSA), 29 U.S.C. Sections 201 et seq., provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  However, the FLSA expressly exempts from this requirement "any

4

employee employed in a bona fide executive, administrative, or professional capacity." 29

U.S.C. § 213(a)(1).

29 C.F.R. § 541.301, a federal regulation promulgated under the FLSA, provides:

(a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:

(1) The employee must perform work requiring advanced knowledge;
(2) The advanced knowledge must be in a field of science or learning; and
(3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

(b) The phrase "work requiring advanced knowledge" means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. Advanced knowledge cannot be attained at the high school level.

(c) The phrase "field of science or learning" includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning.

(d) The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree….

29 C.F.R. § 541.301.

From January 3, 2010 to January 31, 2012, Appellant was employed as a research

biologist in Dr. Chen's laboratory in the Anesthesiology Department of Respondent's School of

Medicine. In May of 2010, Appellant was promoted to Senior Research Technician. Appellant

has a medical degree from China, equivalent to a PhD in the United States, followed by a medical internship and residency, and a Master of Science degree in Biological Sciences from Southern Illinois University at Edwardsville, specializing in cell and molecular biology. Based on the foregoing, Appellant clearly satisfies 29 C.F.R. § 541.301(a)(2), having advanced knowledge in a field of science; and 29 C.F.R. § 541.301(a)(3), having advanced knowledge customarily acquired by a prolonged course of specialized intellectual instruction.

Appellant also satisfies 29 C.F.R. § 541.301(a)(1), performing work for Respondent requiring advanced knowledge. The requirements for Appellant's position in Dr. Chen's lab were a Master of Science degree, two years' experience in a laboratory setting, and "an equivalent combination of education and experience equaling seven years." Appellant's credentials met these requirements, including her "seven or more" years of biology-related education. Appellant was hired by Dr. Chen to perform molecular biology research, which is work requiring advanced knowledge. In performing her work in Dr. Chen's lab, Appellant "generally use[d] [her] advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." 29 C.F.R. § 541.301(b).

Appellant maintains she was basically a technician following protocols and did not exercise any creativity in her work at the lab. As such, Appellant claims she was not truly working as a learned professional in Dr. Chen's lab, and thus not exempt under 29 C.F.R. § 541.301. We note that "creativity" is not a benchmark for determining whether Appellant worked as a learned professional in Dr. Chen's lab.

Despite Appellant's attempts to downplay her skills and expertise as a research biologist working on complex embryonic stem (ES) cell research in Dr. Chen's lab to mere technical work following directions, we find substantial evidence in the summary judgment record

6

demonstrating otherwise. Although following scientific protocols and exercising technical proficiency were required in Appellant's work for Dr. Chen, we do not find that such requirements and the exercise of technical skill diminish the complexity of the work or the advanced intellectual knowledge, training, and experience necessary for Appellant's performance of her job. Rather, they were in addition to the intellectual complexity of the job. The use of manuals, guidelines, or other established procedures containing or relating to highly complex technical or scientific matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption. 29 C.F.R. §541.704. Further, the phrase "field of science or learning" explicitly included in 29 C.F.R. § 541.301 includes work in the biological sciences that has a recognized professional status as distinguished from the mechanical arts or skilled trades. 29 C.F.R. § 541.301(c).

Appellant contends it is error to only consider her academic training and the complexity of the duties she performed and argues she does not meet the standard of a learned professional because she was not able to exercise independent discretion and judgment in her job.

As noted, under 29 C.F.R. §541.301(a), to qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. The regulation further defines "work requiring advanced knowledge" as work that is predominantly intellectual in character and that requires the "consistent exercise of discretion and judgment," as distinguished from performance of routine mental, manual, mechanical or physical work. 29 C.F.R. §541.301(b). This type of work generally requires use of the employee's advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. Id.

7

The summary judgment record is replete with examples demonstrating the discretion and judgment Appellant exercised in her work in the lab.

Appellant's skill in performing molecular biology research was utilized in Dr. Chen's lab to conduct ES cell research to discover what causes human beings to itch, particularly in connection with the administration of anesthesia. In furtherance of making that discovery, Appellant experimented with mice. Viewed generally, the research "experiment" sought to inject mutated mouse DNA into mouse ES cells, multiply those cells in a petri dish, then inject the mutated ES cells into a live mouse, all in an attempt to breed the mouse and have its offspring maintain the mutated DNA.

Vital to the research project was Appellant's creation and use of knock-out mice. A knockout mouse is a laboratory mouse in which researchers have inactivated, or "knocked out," an existing gene by replacing it or disrupting it with an artificial piece of DNA. The loss of gene activity often causes changes in a mouse's biochemical characteristics. Knocking out the activity of a gene provides valuable clues about what that gene normally does. Humans share many genes with mice. Consequently, observing the characteristics of knock-out mice gives researchers information that can be used to better understand how a similar gene may cause physical reactions or behavior in humans, such as the itching caused by anesthesia.

Appellant managed the mice colony; independently weaned, kept, sacrificed and separated mice; and assured that all of the relevant protocols and requirements were followed. Appellant made decisions and deductions based on observation, analysis and interpretation in conducting her research. She monitored data to assure consistent quality by recording it and analyzing it. She compared and evaluated DNA markers by looking at bands in order to determine if she had correct recombined clones.

8

She used a technique called a "GRPR[3] conditional knock-out targeting vector," which showed "where to detect the gene, where to amplify the fragments of the DNA to confirm if the culture DNA have been successfully electroporated[4] into the ES cells," and "which fragment is the one to amplify in relation to the protocol." In using the GRPR conditional knock-out targeting vector, Appellant interpreted images with bands and smears to determine and confirm that she had genomic[5] DNA.

After isolating cells through visual selection, Appellant would analyze them with the polymerase chain reaction (PCR)[6] machine to determine if the clone was positive and to amplify the DNA so it could be run on the gel to be visible.

Appellant stated she independently performed the steps of her research duties, which required the exercise of her judgment in selecting, screening, picking, isolating, and splitting cells. She exercised discretion in these steps and took the initiative to modify, optimize, and follow a protocol, and did it on her own and without supervision.

We find the foregoing undisputed facts, as attested to by Appellant and supported by the summary judgment record, are sufficient to demonstrate she consistently worked with discretion and exercised judgment in performing her work in Dr. Chen's lab. There are many more facts in the record demonstrating Appellant's exercise of judgment and discretion in her work, the complexity of which are beyond the understanding of anyone without an advanced scientific

---

[3] Gastrin-releasing peptide receptor. Mice lacking neurons expressing GRPR, a molecular signature for the putative itch-specific labeled line in the spinal cord, nearly eliminate their scratching response to a range of pruritic stimuli without altering normal nociceptive transmission.

[4] "Electroporation" is a molecular biology technique in which an electrical field is applied to cells in order to increase the permeability of the cell membrane, allowing chemicals, drugs, or DNA to be introduced into the cell.

[5] Genomic means having a full set of chromosomes; or all the inheritable traits of an organism.

[6] PCR is a technology in molecular biology used to amplify a single copy or a few copies of a piece of DNA across several orders of magnitude, generating thousands to millions of copies of a particular DNA sequence.

background.  However, one thing is certain: Appellant's work required the constant application of advanced knowledge acquired by a prolonged course of specialized intellectual instruction, and it required the exercise of her discretion and judgment as well.  As such, from January 3, 2010 to January 31, 2012, Appellant was employed by Respondent as an employee exempt from the overtime pay requirements of FLSA and the Missouri minimum wage law as a learned professional under 29 C.F.R. §541.301.  Point I is denied. [7]

Points II, III and IV – Whistleblower Wrongful Discharge

Causation, Damages, and Public Policy Violations

The trial court found Respondent was entitled to judgment as a matter of law on Appellant's wrongful discharge claim based on lack of causation, lack of damages, and lack of whistleblowing.  In her second, third, and fourth points, Appellant challenges those findings, respectively.  Appellant asserts her discharge immediately after she complained of Dr. Chen's violations establishes a causal connection between her discharge and her whistleblowing; she sustained damages from her discharge in that she lost at least 22 days of income,[8] suffered emotional distress and may recover nominal damages; and she reported four separate violations of clearly mandated public policy by Dr. Chen, to-wit: a violation of federal grant guidelines, research misconduct, a violation of immigration law, and a violation of wage and hour law, to support her whistleblower theory.

In Missouri, employees who have no contract for a certain term of employment are employees-at-will.  Brenneke v. Dep't of Mo., Veterans of Foreign Wars of U.S. of Am., 984

---

[7] Additionally, we note that although not dispositive of the issue, Appellant conceded in her deposition that she knew her position was exempt and this fact was acceptable to her.  She acknowledged she was willing to work longer hours, including weekends and holidays, as an exempt employee.

[8] Appellant did not assert the loss of payment for 22 accrued but unused vacation days as damages in her petition. She also used the accrued days as vacation days for which she was paid.

S.W.2d 134, 137 (Mo.App. W.D. 1998). An employee-at-will generally has no right to sue for wrongful discharge even if the employee was terminated without cause. Id. However, limited public policy exceptions have been carved out for wrongful discharge claims when the employer's act of termination is in furtherance of a violation of a statute, regulation, or constitutional provision. See Lynch v. Blanke Baer & Bowey Krimko, Inc., 901 S.W.2d 147, 150 (Mo.App. E.D. 1995).

Under the four recognized public policy exceptions, a wrongful discharge action can be brought by an employee-at-will who is terminated for: (1) refusing to perform an illegal act; (2) reporting violations of law or public policy to superiors or public authorities; (3) participating in acts encouraged by public policy, such as jury duty, seeking public office, or joining a labor union; or (4) filing a workers' compensation claim. Brenneke, 984 S.W.2d at 138.

In the instant case, Appellant claims she was terminated under the second exception for reporting Dr. Chen's violations of law and public policy to Respondent. A public-policy exception to the employment-at-will doctrine provides that an employer may be liable for damages if the employer terminates an at-will employee for reporting wrongdoing or violations of law to superiors or public authorities. Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 92 (Mo.banc 2010). The employee's "whistleblowing" need not be the exclusive cause of termination, but only a contributing factor. Id. at 94-95.

In order to properly plead a claim of wrongful discharge in violation of public policy under Missouri law, a plaintiff must allege (1) she reported a violation of the law or a well-established and clear mandate of public policy to a superior or public authority; (2) the defendant terminated her employment; and (3) there is a causal connection between her discharge and her report. Keveney v. Missouri Military Academy, 304 S.W.3d 98, 103 (Mo.banc 2010); Custom

11

Hardware Eng'g & Consulting, Inc. v. Dowell, 2011 WL 1743662, at *9 (E.D. Mo. May 5, 2011); Cannon v. SSM Health Care, 2014 WL 3600405, at *4 (E.D. Mo. July 22, 2014).

In a submissible whistleblower claim, the plaintiff "establishes that [she] reported a violation of law or 'well-established and clearly mandated public policy' to [her] supervisors or to legal authorities, that the employer then discharged [her], and that there is a direct causal connection between the protected activity (the whistleblowing) and the discharge." Holmes v. Kansas City Missouri Bd. of Police Com'rs ex rel. Its Members, 364 S.W.3d 615, 624 (Mo.App. W.D. 2012), quoting Bennartz v. City of Columbia, 300 S.W.3d 251, 257 (Mo.App. W.D. 2009).

Thus, for Appellant's wrongful discharge claim to have merit, she must have reported misconduct by Dr. Chen and then, as a result, been fired. The following facts were adduced in the summary judgment record with regard to the chain of events leading up to and surrounding Appellant's discharge from her employment in Dr. Chen's lab.

On November 7, 2011, Appellant arrived at the lab at 9:10 a.m., which was 10 minutes late. Dr. Chen had recently reminded his research assistants that they needed to adhere to the 9:00 a.m. to 5:00 p.m. schedule, because some were deviating from the schedule. On November 7, upon her late arrival, Dr. Chen told Appellant she needed to be in the lab by 9:00 a.m. Appellant argued with Dr. Chen that her working hours should be more flexible because she was exempt, as noted in the letter agreement employing her as Dr. Chen's Research Assistant.[9] After being unable to come to a mutually satisfactory compromise on Appellant's working hours, Appellant and Dr. Chen agreed on November 7, 2011, that Appellant's employment in his lab would end effective January 31, 2012. Appellant also told Dr. Chen during this discussion she

_____

[9] The letter agreement also stated that Appellant's position was contingent upon continued receipt of grant funding, which was expected to continue until at least September 23, 2011. The agreement further provided: "If your position is eliminated due to the discontinuation of funding, you will be given a minimum of 30 days' notice."

12

wanted to take 22 days of accrued vacation time prior to the end of her employment on January 31, 2012.

Appellant first made complaints about Dr. Chen on November 9, 2011, two days after she and he agreed upon her January 31, 2012 termination date, when she met with Lanelle Coleman (Coleman) of Human Resources. At this meeting, Appellant complained to Coleman that Dr. Chen was treating the end of her employment as a quit, when Appellant believed she was being constructively forced to leave because as an exempt employee, she should have working hours more flexible than from 9:00 a.m. to 5:00 p.m. weekdays, but Dr. Chen would not agree to that.

On December 1, 2011, Appellant met with Legail Chandler (Chandler), the Director of Human Resources, and made the allegations asserted in her petition in support of her wrongful discharge claim that Dr. Chen was violating federal grant guidelines by having Appellant do work for his brother's lab at another university, was violating immigration law by employing illegal aliens, was violating wage and hour laws by having employees work overtime without commensurate pay, and was falsifying his research.

During the weekend of December 4-5, 2011, Appellant failed to come into the lab to select and freeze cells, which necessitated another researcher, upon discovering Appellant's failure, to step in to save the cells, which in turn led Dr. Chen to transfer Appellant's embryonic stem cell work to another researcher to "rescue" the cells and avoid wasting further resources.

On December 5, 2011, Dr. Chen emailed Appellant stating, "I am not in any position to continue to supervise you because it has been obvious to me that you think you know more than me on ES cell works and disagree with everything I said. The most important and urgent goal for me is to ensure that we are able to rescue these ongoing ES cells so that ours and collaborator's resources won't be wasted again. Therefore, it is best for [Xian Yu] to take over

13

these important ES cells simply because I have confidence that he would follow the protocols strictly. I would not tolerate any violation of ES cell protocol anymore."

Dr. Chen then discovered more mistakes made by Appellant in her research and in managing the mice colony. Dr. Chen testified in his deposition that the combination of Appellant's costly mistakes and belligerent behavior in his lab resulted in his decision to talk to Human Resources about her because he could not work with her and needed to protect the integrity of the research. Dr. Chen met with Coleman and it was decided they would comply with the terms of Dr. Chen's and Appellant's November 7, 2011 agreement that she would be employed and paid by Respondent through January 31, 2012, but she was for practical purposes relieved of her duties in Dr. Chen's lab as of December 6, 2011.

Appellant maintains she made her whistleblower complaints about Dr. Chen on December 1, 2011; Dr. Chen found out about her complaints on December 2, 2011; and Dr. Chen took action to terminate her on December 6, 2011, immediately after he learned of her allegations about him and in violation of their previous arrangement that her last day of employment would be January 31, 2012.

On the contrary, on November 7, 2011, Appellant and Dr. Chen agreed that Appellant's employment by and with Respondent in Dr. Chen's lab would terminate on January 31, 2012. All of the whistleblower complaints made by Appellant, as alleged in her petition, were made after November 7, 2011. Appellant conceded in her deposition she first started raising her allegations of Dr. Chen's public policy and legal violations at her meeting with Chandler on December 1, 2011. Therefore, they cannot be the cause of her discharge, which was decided on November 7, 2011, and never changed or deviated from by Appellant or Dr. Chen, who were in mutual agreement and satisfaction of it. As such, the facts in the summary judgment record

14

refute Appellant's claim of whistleblower wrongful discharge, primarily and most obviously temporally. There exists no causal connection between her allegations of Dr. Chen's misconduct and her termination from employment. See, Holmes, 364 S.W.3d at 624.

Despite her assertions to the contrary, Appellant was not terminated from employment on December 6, 2011. Rather, because of her behavior and mistakes in the lab, and to preserve the integrity of the research, Dr. Chen stated she need not physically come into the lab after December 6, 2011. Appellant ignores the fact that she was employed by Respondent and received full pay and benefits through January 31, 2012, the agreed-upon termination date that never changed. She even conceded in the summary judgment record that she received full pay and benefits through January 31, 2012. Appellant also was able to take 22 accrued days of paid vacation between December 6, 2011 and January 31, 2012, which she had requested to do and in fact did. Appellant cannot establish any damages resulting from her discharge. See Fleshner, 304 S.W.3d at 92.

Based on the foregoing, Appellant's wrongful discharge claim lacks causation and damages. It fails as a matter of law, rendering the legitimacy of her public policy violation allegations irrelevant and moot, although two complaints were admittedly made by Appellant without any personal knowledge of their veracity and all four were investigated by Respondent and determined to be without merit. Accordingly, Points II, III and IV are denied.

### Point V

In her fifth point, Appellant reasserts her entitlement to unpaid overtime, unpaid wages and vacation pay in her claims for unpaid statutory wages (Count III), quantum meruit (Count IV), and unjust enrichment (Count V). These statutory and equitable claims collapse because their legitimacy depends upon the validity of Appellant's claims for overtime pay under state

15

minimum wage law and FLSA claims, which we have determined fail as a matter of law. The claims overlap in terms of asserting the same damages, which Appellant has not and cannot prove for the reasons set forth *supra* in this opinion with regard to overtime pay and because Appellant admitted she received her full salary and benefits through January 31, 2012, the agreed-upon date of her separation. In addition, Appellant did not assert unpaid accrued vacation as damages in her petition, so she cannot assert it now; she requested the use of her vacation time during the holidays, which request was granted; and she used the accrued days as paid vacation days, so she cannot now be heard to complain she did not receive monetary compensation for those days as unused.

Appellant was paid in full for her work for Respondent and was not due any wages, overtime or accrued vacation pay. Accordingly, Respondent was entitled to judgment as a matter of law on Appellant's claims for unpaid wages, quantum meruit, and unjust enrichment. Point V is denied.

## Conclusion

The trial court's judgment is affirmed.

_Sherri B. Sullivan_
Sherri B. Sullivan, P.J.

Mary K. Hoff, J., and
Philip M. Hess, J., concur.

16