

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| SCOTT CALDWELL, | ) | No. ED111923 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Joseph L. Walsh III |
| UNIFIRST CORPORATION, and | ) | |
| MICHAEL DEAN SEEVER II, | ) | |
| | ) | |
| Respondents. | ) | FILED: May 28, 2024 |

### Introduction

Scott Caldwell ("Caldwell") suffered a back injury while working for UniFirst Corporation ("UniFirst"), causing him challenges in performing his work. After a period of unpaid leave, Caldwell was terminated. Caldwell filed this action alleging discrimination and retaliation under the Missouri Human Rights Act (the "MHRA")[1] and further alleging retaliation under Missouri's Workers' Compensation Law.[2] The jury returned verdicts in favor of Caldwell on all of his claims. Caldwell now appeals from the trial court's judgment reversing the jury verdicts and granting judgment notwithstanding the verdict ("JNOV") to UniFirst and Michael Dean Seever II ("Seever") (collectively, "Respondents"). In his points on appeal, Caldwell alleges the trial court erred in granting Respondents' motion for JNOV because he adduced

---

[1] See Section 213.010–070. All Section references are to RSMo (2016), unless otherwise noted.
[2] See Section 287.780.

substantial evidence to support the jury's findings on his claims of disability discrimination and retaliation under the MHRA. Caldwell also claims that he presented substantial evidence to support a jury finding that his filing of a workers' compensation claim was a contributing factor to his termination.

The record before us shows that Caldwell adduced substantial evidence that he could complete the essential functions of his job with or without the reasonable accommodation of a helper and that his disability was a contributing factor to his termination. The record also contains substantial evidence that Caldwell opposed discrimination on the basis of disability, supporting his claim of retaliation. The trial court therefore erred in granting JNOV on Caldwell's claims of disability discrimination and retaliation under the MHRA, and we reverse the trial court's judgment on those claims. Regarding workers' compensation retaliation, because the record lacks probative facts supporting the jury's finding that Caldwell's filing of a workers' compensation claim was a contributing factor to his termination, we affirm the trial court's grant of JNOV to Respondents on that claim.

Factual and Procedural History

The following evidence, drawn in the light most favorable to the jury's verdicts, was presented at trial.[3]

From April 2012 to July 2015, Caldwell worked as a District Service Manager ("DSM") at UniFirst's St. Louis office. UniFirst is an international textile corporation with 270 locations in the United States and multiple branches and facilities across Missouri. UniFirst services businesses by delivering clean uniforms, floor mats, cloth towels, and paper goods and receiving soiled textiles to launder. A group of employees called Route Service Representatives ("RSRs")

---

[3] Darks v. Jackson Cnty., 601 S.W.3d 247, 254 (Mo. App. W.D. 2020).

2

are primarily responsible for running delivery routes in which supplies are delivered and retrieved. Using company trucks, RSRs run established routes and service ten to thirty customers a day.

### DSM Role & Job Description

As a DSM, Caldwell was a mid-level manager at the St. Louis branch. He supervised one District Service Supervisor ("DSS"), five to six RSRs, and various warehouse personnel. Caldwell was supervised by the Branch Manager, a role initially filled by J.S. Seever assumed the Branch Manager role in November 2014. Caldwell generally worked off-site in the mornings, beginning his days with various customer meetings. After the morning meetings, Caldwell returned to the office, where his daily tasks typically included scheduling, paperwork, training new employees, and reviewing RSRs' paperwork and payments.

The DSM job description (the "job description") listed sixty-three tasks under the header "Essential Functions." One function required DSMs to provide route coverage as needed. DSMs were third in line to run routes, preceded first by RSRs and second by the DSS. Only when neither RSRs nor DSS were available would a DSM provide route coverage. Because a DSM may have to cover routes due to unexpected illness, vacation, or other absence among the RSRs and DSS, there was no set frequency with which a DSM ran routes. Caldwell testified that Seever explained a DSM should only run routes once to twice per month. Caldwell further testified that a DSM was expected to perform many other duties unrelated to running routes, and he reasoned: "My job was, as a manager, to handle customers, to deal with my [RSRs], to train people. Being out on route was not an essential portion of my job, being one to two times a month."

Additionally, the job description required DSMs to be capable of lifting eighty pounds. The parties appear to agree that such lifting occurred only when a DSM covered routes. Caldwell, however, testified that no item on the delivery truck weighed eighty pounds, and, in fact, no item weighed more than twenty-five pounds. Caldwell further explained he had never had an occasion requiring him to lift eighty pounds, nor had he ever trained a newly hired RSR to lift eighty pounds at once. Caldwell described that such lifting was not necessary because he could divide large delivery loads into smaller bundles: "I mean, you could pick up one mat at a time, you could take a couple of bundles of uniforms at a time, or you could just use the cart that was provided and not have to lift much of anything at all."

At trial, the jury heard deposition testimony from UniFirst's Corporate Representative, who was asked about the eighty-pound lifting requirement:

Q:     So is lifting [eighty] pounds the essential function itself or is it more like the manner in which an essential function is customarily performed?
A:     I guess you can describe it like that, it goes to the manner.

### *Injury, Diagnosis, and Initial Accommodations*

In January 2014, Caldwell sustained an injury while covering a route. Initially, he believed he had pulled a muscle, but he sought medical care when the pain intensified. His physician diagnosed him with a disc extrusion and left lumbar disc protrusion. Caldwell received steroid injections to manage the pain. For twelve to fourteen months, the injections allowed Caldwell to return to a sense of normalcy. Working with the branch manager at the time, J.S., Caldwell was given an accommodation in which a warehouse employee or other employee (a "helper") would accompany Caldwell on occasions when he had to cover routes. The helper assisted Caldwell with lifting when Caldwell's injury prevented him from doing so. Caldwell testified that, with the accommodation, he could cover routes. UniFirst's Corporate

4

Representative similarly testified that Caldwell was capable of performing the DSM role, including covering routes, with accommodation.

***Seever Begins as Branch Manager, Caldwell Files for Workers' Compensation***

In November 2014, Seever replaced J.S. as UniFirst's St. Louis branch manager. In December, Caldwell received another steroid injection. Caldwell's physician wrote a note instructing him to take a week off of work for recovery and to return on temporary light duty status, which would limit Caldwell's lifting and movement. Upon receiving the physician's note, Seever phoned Caldwell and "berat[ed]" him for making an "unacceptable" request. Seever instructed Caldwell to "find a new doctor" because his current physician "doesn't know what he's doing." Around this time, Seever made comments to Caldwell about his back injury, such as calling Caldwell "fat" and telling Caldwell that, "if [he] lost the weight, [he] wouldn't have any back problems."

Pursuant to his physician's instructions, Caldwell returned to work on light duty status. Caldwell's physician recommended extending light duty status through February 2015. That month, Caldwell continued to cover routes as necessary, sometimes with a helper.

On February 19, Caldwell had an MRI which showed Caldwell continued to have a lumbar disc protrusion. Caldwell's physician issued a note to Respondents, stating: "Due to recent MRI findings[, Caldwell] must remain on light duty until a surgical consult is performed. Absolutely no lifting or carrying over [ten pounds], no repetitive bending or long periods of sitting." The surgical consult occurred on February 24, and surgery was scheduled for March 11.

On February 24, in anticipation of his scheduled surgery, Respondents confirmed in an internal email that Caldwell would remain on light duty through March 6 and begin leave under the Family Medical Leave Act ("FMLA") on March 9.

5

Because Caldwell's physician informed him that work-related activity may have contributed to his injury, Caldwell decided to file for workers' compensation. On March 11, Caldwell told Seever of his intention to file a workers' compensation claim, which was submitted on March 12. Respondents began processing Caldwell's claim with a third-party service that defended UniFirst against workers' compensation claims. This process resulted in Caldwell postponing his scheduled surgery.[4]

Due to the scheduling changes, Caldwell did not begin FMLA leave as anticipated, and he worked on March 9, 12, and 13.

### Revocation of Accommodations

On March 13, a Human Resources Representative ("HR Representative") emailed Seever, stating: "I reviewed the latest doctor's note on [Caldwell] and I've written a non-reasonable accommodation letter for [Caldwell]. When you speak to [him,] please let him know that we can no longer accommodate his restrictions and he will have to go out on leave." The referenced letter stated, in relevant part, that Respondents would not continue to provide Caldwell with accommodations and there were "no accommodations . . . available that are both reasonable and that will not subject [UniFirst] to undue hardship." In the letter, Respondents committed to working with Caldwell to ensure he was "fully functional" in his position. The letter stated, "By 'fully functional,' we mean that you must be able to do all of the essential functions of your job." That same day, Seever signed the letter and gave it to Caldwell.

At trial, Seever was asked about the phrase "fully functional":

---

[4] The record is not precise about the extent of delays attributable to the third-party service or why these delays occurred. Relevant to this appeal, however, the record establishes that Respondents contested the claim and scheduled an initial medical appointment for Caldwell on April 14, 2015, which he attended. Respondents did not provide any other treatment.

Q: In the UniFirst letter that you signed and UniFirst HR drafted, does the phrase "fully functional" mean that [Caldwell] must be able to perform the DSM job and the RSR job with or without accommodations?

A: Correct.

Q: Which one, with or without?

A: Without.

Seever testified that Respondents would not allow Caldwell to return to work so long as he needed an accommodation, nor would Respondents consider any accommodation for Caldwell, because Respondents required Caldwell "to be able to fully do his job without any restrictions." Seever testified that he wanted only "full" and "able bod[ied]" employees on his team.

### *Forced FMLA Leave and May 8 Email*

Against his wishes, Caldwell began the employer-imposed FMLA leave on March 13. Respondents scheduled the FMLA leave to extend through May 29. While on leave, Caldwell continued to seek medical treatment and communicate health updates to Respondents. On April 23, Caldwell's physician wrote a letter permitting Caldwell to return to work with a lifting limit of twenty-five pounds and movement limitations. Caldwell forwarded the letter to Seever via email, saying, "I was wanting to know when I can return to work as I am ready to do so." Seever responded that he had not received "clearance" for Caldwell to return. On April 29, Caldwell's physician wrote another letter, also issued to Respondents, reiterating that Caldwell may return to work with lifting and movement limitations.

On May 7, Respondents informed Caldwell that he could not return to work due to his continued restrictions:

> As you know from prior correspondence, your ongoing lifting limitation prevents you from fully performing your job duties as a [DSM]—which requires an ability to lift and carry [eighty] pounds, five days per week, in order to provide route coverage. Being limited to lifting or carrying less than [eighty] pounds would render you unable to perform the essential functions of the job.

Caldwell responded by email on May 8 (the "May 8 Email"), stating:

7

> I received your letter dated 5/7/15.  I have forwarded it on to my doctor and am awaiting his response.
>
> I want to let you know that ***I am ready to work, willing to work and can do the essential functions of my managerial duties.  I read and disagree with the letter that lifting [eighty pounds], [five] days a week is an essential part of my job.***
>
> When we were at lunch . . . we had conversation where you stated that a Branch Manager should be out on route once a year, [DSMs] should be on route [one to two] times a month and [DSSs] should be on route [two to three] times a week.  Prior to being forced to take leave in March, I was not having to cover routes as we were staffed.

(Emphasis added).  Caldwell then mentioned his workers' compensation claim and expressed

confusion over his continued forced leave:

> When I learned that I would likely need surgery, I spoke to [the general manager].  He advised me to file for work comp.  After speaking with my doctor in March, he told me that work certainly could have caused injury, so I had my attorney file a work comp claim.  After my attorney filed for work comp on 3/10/15 and I told you about the claim, ***I received a letter from you on 3/13/15 that forced me to take leave and file for FMLA leave.***
>
> Per you[r] letter dated 4/27/15 you stated that my FMLA leave was denied and UniFirst extended me non FMLA medical leave for [five] weeks.  Then [in] your letter dated 5/7/15 you state that my FMLA leave will run out on 5/29/15.  If I am not on FMLA leave, how would my FMLA job protection expire on 5/29?  After filing work comp, UniFirst did not schedule my first appointment until 4/14/15.  After my appointment on 4/14, no other treatment was provided to me by UniFirst.  Just this week, my attorney was notified on 5/4 that work comp would provide no treatment to me.
>
> As you know, I wanted to keep working ***and look forward to coming back as soon as you will let me.***

(Emphasis added).  On May 11, Caldwell's physician faxed a notification to Seever, reiterating

that Caldwell had permission to return to work: "As stated previously in my correspondence

dated 4/23/15 and 4/29/15, [Caldwell] has been able to return to work with [lifting and

movement accommodations]."  Seever responded to Caldwell on May 18, instructing him to tell

Respondents when he would be able to return to work and complete his DSM functions.

8

Caldwell underwent spinal surgery on May 27. That same day, his surgeon wrote a letter to Respondents alerting them of the surgery and informing them that Caldwell could return to work with restrictions in four weeks and could return to work without any restrictions within eight to ten weeks. At trial, the jury heard deposition testimony from the surgeon that his opinions concerning Caldwell's return dates were made to a reasonable degree of medical certainty.

*Discretionary Non-FMLA Leave*

Caldwell's FMLA leave expired on May 29, two days after his surgery. On June 1, Respondents informed Caldwell by letter that he was being placed on eight weeks of discretionary non-FMLA leave in accordance with UniFirst's policy. The leave was scheduled to exhaust on July 24, though Respondents could extend it at their discretion.

On June 17, Caldwell notified Seever that he had permission from his surgeon to return to work on June 29 with lifting and movement accommodations. Caldwell followed up on June 22, reiterating that he was "anxious to return" to work, but received no response from Respondents. Caldwell again wrote Seever on July 2, stating that he had experienced no setbacks post-surgery and anticipated returning to work. Caldwell attached a statement from his surgeon opining that Caldwell could return to work without accommodations on August 3. Respondents did not reply. At trial, Caldwell testified that he expected to return on August 3 "without any restrictions," including "no weight limit, nothing."

Additionally, on June 23, HR Representative advised Seever by email that Seever could not terminate Caldwell at that time because he was on approved leave: "I left you a message because I wanted to follow up with you before you send [a letter] out to [Caldwell]. You cannot

9

term[inate] [Caldwell] because we granted him Non-FMLA [leave] until July 24, 2015 per our June 1 letter to him."

On July 27, 2015, Seever sent Caldwell a letter, drafted by HR Representative, alerting Caldwell that his position had been replaced. Caldwell responded on July 29, asking if he had been terminated and reiterating that he would be able to return to work, without restrictions, on August 3. Seever responded that Caldwell's previous position had been filled, adding: "Also, we never actually received a letter from your doctor that you have been released to fully [sic] duty at any time. So yes you have been terminated."

### *Additional Trial Testimony*

Seever testified that in early 2015, the St. Louis branch was "wildly short-staffed," which required DSMs to run routes more frequently. Several UniFirst employees, including Corporate Representative, offered similar testimony. Seever also described a system "already in place" at the St. Louis branch, in which temporary employees, employees from other branches, and warehouse staff would provide route coverage as needed.

Additionally, an employee ("Coworker") who worked under Seever at UniFirst in 2015, testified about Seever's conduct preceding Caldwell's termination. Coworker testified that Seever often "discuss[ed] ways to get rid of [Caldwell] . . . because [Caldwell] kept giving light duty notices [and] kept giving those restrictions." Coworker further testified that Seever believed Caldwell was "faking" his injury, "mock[ed] and laugh[ed] when [Caldwell] would have to lift things," and joked about Caldwell's weight. According to Coworker, Seever was "plotting ways" to fire Caldwell, and forcing Caldwell on leave was part of a scheme to "burn up" Caldwell's protected time, thereby enabling Respondents to fire him. Coworker recalled Seever saying, "[Caldwell] going out for surgery was a perfect excuse to get rid of him."

10

*Procedural History*

Caldwell subsequently filed a petition in the circuit court alleging five claims, three of which were submitted to the jury: MHRA disability discrimination (Count I, against Respondents), MHRA retaliation (Count III, against Respondents), and workers' compensation retaliation (Count IV, against UniFirst).[5] Caldwell sought compensatory and punitive damages.[6]

The case proceeded to a five-day jury trial. After Caldwell rested, Respondents moved for directed verdict on all counts, which the trial court denied. Respondents renewed their motion at the close of all evidence. The trial court again denied their motion, noting: "The Court believes that the urging of a motion for directed verdict at this stage is improper because there are clearly questions of fact for the jury to resolve based upon the issues of credibility, who they believe. There's disputed evidence."

The jury returned its verdicts in favor of Caldwell on all three claims. For each claim against UniFirst, the jury awarded Caldwell $150,000 in compensatory damages and $2,000,000 in punitive damages. On each of the two claims against Seever, the jury awarded Caldwell $1.00 in compensatory damages and $4,000 in punitive damages.[7]

---

[5] Caldwell also brought a claim under the MHRA for failure to accommodate his disability (Count II) and a claim for wrongful discharge (Count V), neither of which were presented to the jury.

[6] Before trial, Caldwell moved for summary judgment, which the trial court denied. Respondents did not move to dismiss, nor did Respondents move for summary judgment.

[7] Although not the subject of this appeal, we note that the trial court entered an initial judgment on April 14, 2023 concluding that the damages awarded by the jury on the separate counts were based on the same injury and were, therefore, duplicative. The jury returned a total of ten verdicts for compensatory and punitive damages totaling $6,458,002 against UniFirst and Seever on the various discrimination and retaliation counts. To avoid a duplication of damages, the trial court entered judgment for compensatory and punitive damages against UniFirst only on the workers' compensation retaliation claim and against Seever only on the MHRA disability discrimination claim. The damages on these counts total $2,154,001. Caldwell then filed a motion to amend the judgment to reflect the compensatory and punitive damages set forth by the jury in all of the ten verdicts, $6,458,002. In granting JNOV to Respondents, the trial court vacated its initial judgment and denied as moot Caldwell's motion to amend the judgment. Because we reverse the trial court's entry of JNOV only with regard to Counts I and III, on remand we do not order the trial court to reinstate the Judgment of April 14, 2023 vacated by the trial court. The trial court will be required to enter judgment based upon the jury verdicts returned only on the counts of disability discrimination and disability retaliation. Because the issue of duplicative damages has not been raised on appeal, we do not and cannot address that issue with this opinion.

11

Respondents moved for JNOV, arguing that Caldwell failed to make a submissible case. Specifically, as to disability discrimination, Respondents argued Caldwell failed to establish that he met the statutory definition of "disability," in that he failed to adduce substantial evidence to prove that he could perform an essential function of his job, providing route coverage which entailed lifting up to eighty pounds, with or without reasonable accommodation. Respondents further argued that Caldwell failed to establish that his disability was a contributing factor to his termination. As to retaliation under the MHRA, Respondents argued that Caldwell did not adduce substantial evidence that he engaged in any "protected activity" because the May 8 Email was a request for an accommodation and was not opposition to discriminatory conduct. Lastly, concerning workers' compensation retaliation, Respondents argued that Caldwell did not adduce substantial evidence that his filing of a workers' compensation claim was a contributing factor to his termination.[8] The trial court agreed with Respondents' arguments and granted the motion for JNOV on all three counts. Caldwell now appeals. Before the case was submitted in this Court, Caldwell filed a motion for attorney fees and expenses on appeal, and we ordered the motion taken with the case.

### Points on Appeal

Caldwell raises three points on appeal alleging the trial court erred in granting Respondents' motion for JNOV. Point One addresses Caldwell's MHRA disability discrimination claim and maintains Caldwell adduced substantial evidence that he could perform the essential functions of his DSM job with or without reasonable accommodation and that his disability was a contributing cause of his termination. With respect to his MHRA retaliation

---

[8] Respondents also raised issues concerning punitive damages, and, in the alternative, moved for remittitur or reduction of punitive damages or a new trial. The trial court did not decide on these issues, and they are not before this Court.

12

claim, Point Two posits that Caldwell's May 8 Email constitutes substantial evidence that Caldwell opposed discrimination on the basis of disability prior to his termination. In Point Three, Caldwell avers that he proffered substantial evidence to support the jury's finding of a causal relationship between his filing of a workers' compensation claim and his subsequent termination.

<u>Standard of Review</u>

"Granting a motion for JNOV is a drastic action and should only be granted when reasonable persons could not differ on the correct disposition of the case." <u>McKinney v. Mercy Hosp. St. Louis</u>, 604 S.W.3d 680, 686 (Mo. App. E.D. 2020) (internal citation omitted). We indulge a presumption favoring the reversal of a JNOV, which will only be overcome when there is a complete absence of probative facts to support the jury's finding. <u>Darks v. Jackson Cnty.</u>, 601 S.W.3d 247, 259 (Mo. App. W.D. 2020).

We conduct de novo review of a trial court's decision to grant a defendant's motion for JNOV. <u>Id.</u> It is neither our role, nor the trial court's, to weigh evidence, determine witness credibility, or resolve conflicting testimony.[9] <u>Wickham v. Hummel</u>, 659 S.W.3d 345, 356 (Mo. App. W.D. 2022); <u>see</u> <u>Harrison v. Harris-Stowe State Univ.</u>, 626 S.W.3d 843, 855 (Mo. App. E.D. 2021) ( "[T]he jury alone, as the trier of fact, is the sole arbiter of witness credibility."). Rather, our review is limited to determining whether the plaintiff made a submissible case by supporting each essential element with substantial evidence. <u>Id.</u> "Substantial evidence is evidence, which, if true, is probative of the issues and from which the jury can decide the case." <u>McKinney</u>, 604 S.W.3d at 686 (internal citation omitted). In reviewing a submissibility issue,

---

[9] Although we will not quote the record in full, the trial court expressly and aggressively questioned Caldwell's credibility. In light of the jury's exclusive role as factfinder, the trial court exceeded its authority when engaging in credibility assessments.

13

we consider the evidence in the light most favorable to the plaintiff, giving him the benefit of all reasonable inferences and disregarding the defendants' evidence except to the extent it furthers the plaintiff's arguments. Darks, 601 S.W.3d at 254; Bare v. Carroll Elec. Coop. Corp., 558 S.W.3d 35, 42 n.8 (Mo. App. S.D. 2018); see also Hickman v. May Dep't Stores Co., 887 S.W.2d 628, 630 (Mo App. E.D. 1994) (noting that we will not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences). We disregard all evidence and inferences conflicting with the jury's verdict. McKinney, 604 S.W.3d at 687.

Discussion

**I. Point One—Disability Discrimination Under the MHRA**

To make a submissible case of disability discrimination under the MHRA, an employee is required to show that: (1) he is legally disabled; (2) he was discharged; and (3) the disability was a factor in his discharge. Section 213.055.1(1)(a); McKinney, 604 S.W.3d at 687.[10] The MHRA defines "disability" as:

> a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job, utilizing the place of public accommodation, or occupying the dwelling in question.

Section 213.010(5); McKinney, 604 S.W.3d at 687. For purposes of the MHRA, an employee has a disability if, "despite the substantial limitation the physical impairment otherwise causes, the employee can perform the essential functions of his job with or without a reasonable accommodation[.]" Loerch v. City of Union Missouri, 643 S.W.3d 597, 602 (Mo. App. E.D. 2022), *transfer denied* (Mar. 21, 2022), *transfer denied* (May 17, 2022).

---

[10] The case is subject to the pre-amended MHRA's "contributing factor" standard, which was in place until August 28, 2017. See Clark v. AT&T Mobility Servs., L.L.C., 623 S.W.3d 197, 203 (Mo. App. W.D. 2021); see also Section 213.101.4, RSMo (Cum. Supp. 2018) (expressly abrogating the contributing factor causal standard).

14

The parties agree that Caldwell suffered from a physical or mental impairment that substantially limited one or more of his major life activities.  The concept of "reasonable accommodation" is the focus of this point on appeal.  In their motion for JNOV, Respondents submit that Caldwell does not meet the statutory definition of "disability" because he could not complete the essential function of running routes, in which he may have to lift eighty pounds, with or without reasonable accommodation.  Respondents also argued that Caldwell did not adduce substantial evidence from which a jury could find a causal relationship between his disability and his termination.  We address each contested element in turn.[11]

### A.    Essential Function

"Essential functions" generally refer to "fundamental job duties."  Loerch, 643 S.W.3d at 604.  To determine if a particular function is essential, courts may consider: (1) the employer's judgment; (2) written job descriptions prepared before the employer began advertising or interviewing for the position; (3) the amount of time spent performing the function; (4) the consequences of not requiring the employee to perform the function; and (5) the past or current work experience of employees in similar jobs.  Id. (quoting Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 822 (Mo. banc 2007), *abrogated on other grounds by* Section 213.101.4, RSMo (Cum. Supp. 2018)) (considering the totality of circumstances to determine if a function is essential).  "Notably, the employer's view on which functions are essential is but one factor to be considered under this test."  McKinney, 604 S.W.3d at 688.

For support, Respondents point to the job description, where "Provid[ing] route coverage as needed" is one of sixty-three enumerated essential functions.  The job description also

_____

[11] We address only those elements challenged by Respondents' in their motion for JNOV.  See Koppe v. Campbell, 318 S.W.3d 233, 240 (Mo. App. W.D. 2010) (reviewing on appeal "all grounds raised by the Respondents in their [granted] JNOV motion"); see also Mercer v. BusComm, Inc., 515 S.W.3d 238, 241–44 (Mo. App. E.D. 2017).

15

requires DSMs have the capacity to lift eighty pounds. The job description, however, is only one relevant factor in our analysis and is not determinative. See id. Respondents also urge us to consider testimonial evidence that UniFirst was short-staffed in March 2015, and thus Caldwell, as a DSM, would be more frequently tasked with covering routes where he may have to engage in lifting eighty pounds. However, because our standard of review requires us to view the evidence in the light most favorable to the verdict, we give limited, if any, consideration to this testimony. See id. at 687.

Upon viewing all evidence in the light most favorable to Caldwell, we find substantial evidence in the record supports a jury finding that running routes, in which Caldwell may have to lift eighty pounds, was not an essential function of the DSM role. See id.

First, Caldwell adduced substantial evidence that being able to lift eighty pounds was *never* essential to his job. Caldwell testified that no individual item on the delivery truck weighed more than twenty-five pounds and no employee was required to lift eighty pounds at once. Caldwell further testified that he was responsible for training every newly hired RSR, and he never instructed them that they were required to lift eighty pounds at one time. In its role as factfinder, the jury was entitled to find this evidence credible. See Harrison, 626 S.W.3d at 855.

While Respondents contended that lifting eighty pounds *at once* was essential to the DSM's duties, the jury reasonably may have found credible Caldwell's testimony that during his years in the role, he never needed to lift a single load weighing eighty pounds because he divided large loads into smaller, lighter-weight bundles. In McKinney, we addressed a similar issue. 604 S.W.3d at 687–88. There, an employer argued that it was essential for a housekeeper to conduct her cleaning duties by squatting. Id. at 686. The housekeeper posited that squatting was only one manner through which she could clean, and that she was just as effective at completing

16

her duties by bending at the waist.  Id. at 687.  Concluding that the employer's motion for JNOV was properly denied, we reasoned that "[a]lthough [the employer] may feel strongly that squatting is an essential function of housekeeping, the record contains substantial evidence for the jury to have found [the employee] could perform the essential functions of the job safely . . . by bending at the waist."  Id. at 688.  Here, we similarly recognize that the jury was free to conclude, despite Respondents' argument to the contrary, that it was not essential for Caldwell to lift eighty pounds at once, as he had established a safe and effective alternative method for performing the essential function of his job.  See id.  Further, Corporate Representative testified that lifting eighty pounds was not, in itself, the essential function of the job.  Instead, Corporate Representative stated that the requirement concerned the ***manner*** in which lifting heavy items on the delivery truck could be completed.  Her testimony is consistent with and lends support to Caldwell's testimony that being able to lift eighty pounds at one time was not essential to performing his job as DSM.  See id.

Additionally, Caldwell adduced substantial evidence from which the jury could conclude that DSMs ran routes too infrequently for that job function to be considered essential.  See Loerch, 643 S.W.3d at 604.  Caldwell testified, "Being out on route was not an essential portion of my job, being one to two times a month."  Seever similarly testified that a DSM would only cover routes one or two times a month when UniFirst was fully staffed.  Although the jury heard conflicting evidence about how frequently Caldwell actually went on routes, the jury alone was entitled to assess witness credibility and resolve conflicting testimony.  See Harrison, 626 S.W.3d at 859; see also Loerch, 643 S.W.3d at 605 (finding summary judgment improper in light of conflicting evidence about "the amount of time actually spent" performing an allegedly essential function).  Additionally, Caldwell's testimony recounted numerous daily tasks

17

specifically required of DSMs, such as meetings off-site, supervision, overseeing RSRs' paperwork and payments, scheduling, and training. The jury may have reasonably inferred that performance of those tasks was fundamental to performing the DSM role, but running routes was of substantially lesser importance. See Loerch, 643 S.W.3d at 605.

We are persuaded that the record contains substantial evidence from which the jury reasonably could find that route coverage and heavy lifting were not essential functions of Caldwell's job as DSM. See id. at 604.

### 1. Reasonable Accommodation for the Assumed Essential Function

Because the trial court's judgment appears to find that route coverage, during which Caldwell may need to lift eighty pounds, was an essential function of the DSM role, we alternatively address whether Caldwell adduced substantial evidence that the function was subject to reasonable accommodation.

Under the MHRA, an employee has the burden to establish that he can perform essential functions with reasonable accommodation. Lomax v. DaimlerChrysler Corp., 243 S.W.3d 474, 480 (Mo. App. E.D. 2007). The employer, in turn, has an affirmative duty to make such accommodations to the employee's known limitations. Id. The reasonableness of an accommodation is a question of fact to be determined by the jury. Loerch, 643 S.W.3d at 607. The size and nature of the employer, the type and number of its facilities, and the structure and composition of its workforce compared to the costs of providing the accommodation are all relevant to the reasonableness inquiry. Sherry v. City of Lee's Summit, 623 S.W.3d 647, 655 (Mo. App. W.D. 2021). An accommodation is unreasonable if it imposes undue financial and administrative burdens on the employer or requires fundamental alterations in the employer's program. Lomax, 243 S.W.3d at 480.

18

At trial, the parties agreed that Caldwell requested having a helper assigned to him when he provided route coverage. Again, assuming *arguendo* that route coverage was essential, we first determine if Caldwell met his burden of establishing that he could complete that function with a helper. See id. If so, we must determine whether requesting a helper as an accommodation was reasonable. See id.

As to the first inquiry, our analysis is simple. Caldwell performed his job with the accommodation of a helper under a prior supervisor. Caldwell testified: "With the accommodations, I could cover a route. I could. [J.S.] was making those accommodations happen[,] and I could cover a route." Corporate Representative similarly testified that, with accommodation, Caldwell was able to perform the DSM role. Under our standard of review, we credit this testimony and find Caldwell carried his burden. See Darks, 601 S.W.3d at 254; Lomax, 243 S.W.3d at 480.

We next consider whether Caldwell adduced substantial evidence from which a jury could determine that providing a helper was a reasonable accommodation. See Lomax, 243 S.W.3d at 480. We recognize that in its order granting JNOV, the trial court cited federal caselaw holding that, under the Americans with Disabilities Act (the "ADA"), it was unreasonable as a matter of law for an employee to request a helper as an accommodation. See Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 788 (8th Cir. 1998); Ricks v. Xerox Corp., 877 F. Supp. 1468, 1477 (D. Kan. 1995); Peters v. City of Mauston, 311 F.3d 835, 845–46 (7th Cir. 2002); Torres v. RRD Holding Co., No. 3:19-CV-50065, 2021 WL 2375998 at *5 (N.D. Ill. June 10, 2021). We acknowledge the holdings of these federal cases analyzing the issue of reasonable accommodation under the ADA. But Caldwell advances his claim of disability discrimination under the MHRA. We often find federal caselaw in employment discrimination matters to be

19

instructive when reviewing MHRA discrimination claims—but only when the federal law is consistent with Missouri law.  Daugherty, 231 S.W.3d at 818 (noting the MHRA can offer "greater discrimination protection" than federal standards); Lin v. Ellis, 594 S.W.3d 238, 242 (Mo. banc 2020) (noting that the protections provided by the ADA are not identical to those provided by the MHRA).

While Respondents urge that we apply this bright-line rule of the ADA to MHRA claims, doing so would run counter to MHRA caselaw expressly rejecting such per se rules.  See Loerch, 643 S.W.3d at 607–08.  We are guided by our analysis in Loerch, where a custodian's health conditions prevented him from performing select outdoor tasks in extreme weather.  Id. at 606.  The custodian reasoned that he could perform the essential function of his job with the reasonable accommodation of assigning another employee to perform the limited tasks he was unable to complete.  Id.  Like Respondents, the employer in Loerch argued such a request was per se unreasonable.  Id.  We unequivocally disagreed, stating:

> To the extent [ADA-based] cases stand for the proposition that assigning others to perform certain tasks for an employee can *never* be reasonable as a matter of law under the ADA, they are inconsistent with the individualized, fact-dependent, case-by-case approach taken by Missouri courts when determining the reasonableness of an accommodation under the MHRA and are not applicable here.

Id. at 608; Lomax, 243 S.W.3d at 481; Baldridge v. Kansas City Pub. Schs., 552 S.W.3d 699, 710 n.9 (Mo. App. W.D. 2018).  We thus decline to apply the bright-line rule urged by Respondents and instead consider whether Caldwell's request for accommodation by having a helper assigned to him when occasionally running routes was reasonable.

The record reveals substantial evidence from which the jury could determine that Caldwell's request of a helper for the limited purpose of heavy lifting while covering routes was reasonable.  See Loerch, 643 S.W.3d at 608.  The jury heard testimonial evidence that UniFirst

20

was a large corporation, employing over 16,000 people worldwide, including 14,000 in the United States, with 270 locations across the United States and branches across Missouri. See Sherry, 623 S.W.3d at 655. Moreover, Seever testified that the St. Louis branch already had a system in place in which temporary workers, warehouse staffers, and employees from other branches were "already in place to be there" and be available to run routes as needed, including on occasions when Caldwell could not. Seever further testified that temporary workers were "pretty well coming through the door." The jury could reasonably infer from Seever's testimony that Caldwell's requested accommodation would not require fundamental alterations in Respondents' organization. See Loerch, 643 S.W.3d at 606; see also Medley v. Valentine Radford Commc'ns, 173 S.W.3d 315, 322 (Mo. App. W.D. 2005) (considering the reasonableness of an accommodation in light of how "easily" the task could be "replaced by temporary workers"). Moreover, there is no evidence that such accommodation would require full-time or extensive assistance or require adding hours and shifts to existing employees' schedules, factors which we view favorably for Caldwell. See Loerch, 643 S.W. 3d at 608.

We further note that Caldwell adduced evidence that his request for a helper was a temporary need. Caldwell's surgeon testified to a reasonable degree of medical certainty that Caldwell would be able to return to work with no accommodations as of August 3, 2015, just over two months after his back surgery. The record shows that Caldwell repeatedly alerted Respondents of his anticipated return date. At trial, Caldwell testified that he intended his August 3 return to be at a "full duty" status, "without any restrictions . . . no weight limit, nothing." The jury was entitled to rely on this evidence when making a reasonableness determination. See Medley, 173 S.W.3d at 324 (finding relevant to an accommodation's reasonableness whether an employee provided a "possible return time").

21

Viewing this evidence in the light most favorable to Caldwell, we agree that the jury reasonably could have concluded that Caldwell's request for a helper was reasonable and would allow him to complete a DSM's essential functions.  See Loerch, 643 S.W.3d at 606.

### B.    Contributing Factor

Having found either that route coverage was not an essential function of Caldwell's performance as DSM or that Caldwell's request for a helper while performing route coverage could be reasonably accommodated, we now turn to Respondents' remaining ground for JNOV on the MHRA disability discrimination claim: whether the jury reasonably could find that Caldwell's disability was causally related to his termination.

To satisfy the causal element, Caldwell needed only to show that his disability was a contributing factor in his termination.  Lomax, 243 S.W.3d at 479–80.  "A contributing factor is a condition that contributes a share in anything or has a part in producing the effect."  Id. at 482 (internal citation omitted).  If the disability "contributed to the unfair treatment, that is sufficient."  Daugherty, 231 S.W.3d at 819.

To establish retaliatory motive in employment discrimination cases, employees may rely on both direct evidence and inferences.  Holmes v. Kansas City Mo. Bd. of Police Comm'rs, 364 S.W.3d 615, 628 (Mo. App. W.D. 2012).  "Direct evidence is that which shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding that an illegitimate criterion actually motivated the employment decision."  Daugherty, 231 S.W.3d at 818 n.4.  "Direct evidence includes evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude[.]"  Id.  We recognize that, in most instances, "employers are shrewd enough to not leave a trail of direct evidence."  Id.  However, the record shows this is one of the

22

rare cases where the jury heard substantial direct evidence of Respondents' discriminatory animus in relation to the decision to terminate his employment with UniFirst. See id.

For instance, Seever—who fulfilled the role of terminating Caldwell's employment on behalf of UniFirst—testified that he wanted only "full" and "able bod[ied]" employees on his team. Caldwell entered into evidence a letter from Respondents, composed by the HR Representative and signed by Seever, in which Respondents state that UniFirst employees must be "fully functional." When Seever was asked to explain "fully functional," he clarified that it meant Caldwell must be able to perform his role without accommodation. Seever further testified that Respondents would neither allow Caldwell to return to work with accommodation nor consider any accommodation because Respondents "need[ed] [Caldwell] to be able to fully do his job without any restrictions." In reaching a decision on causation, the jury certainly could consider Respondents' refusal to provide **any** accommodation. See Lomax, 243 S.W.3d at 481 n.9 (internal quotation omitted) ("We also note that a denial of a reasonable accommodation may tend to prove that the employer also acted adversely against the employee because of the individual's disability.").

Additionally, the jury repeatedly heard testimony of Seever's general animus toward Caldwell's disability, from which they could infer a retaliatory motive. See Holmes, 364 S.W.3d at 629. Coworker testified that Seever repeatedly "discuss[ed] ways to get rid of [Caldwell] . . . because [Caldwell] kept giving light duty notices [and] kept giving those restrictions[.]" Coworker further described how Seever joked about Caldwell's injury, lodged insults about Caldwell's weight in relation to the injury, and believed Caldwell was "faking" it. Caldwell offered related testimony that Seever "berat[ed]" him when he requested a week off for his back,

23

telling Caldwell that his request was "unacceptable" and demanding that Caldwell find a doctor who "know[s] what he's doing."

This evidence was sufficient for the jury to find that Caldwell's disability was, at minimum, a contributing factor to his termination. See Daugherty, 231 S.W.3d at 819.

After review of the record, we conclude Caldwell proffered substantial evidence from which the jury reasonably could determine that he was "disabled" under the MHRA, and that his disability contributed to his termination. See Section 213.055.1(1)(a); McKinney, 604 S.W.3d at 687. Point One is granted.

## II.     Point Two—MHRA Retaliation

In Point Two, Caldwell maintains the trial court erred in granting JNOV on his retaliation claim under the MHRA.

The MHRA prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any other person because such person has opposed any practice prohibited by this chapter[.]" Lin, 594 S.W.3d at 242 (citing Section 213.070.1(2)). Such prohibited practices include, in relevant part, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . disability[.]" Section 213.055.1(1)(a). To prevail on an MHRA retaliation claim, an employee must establish: (1) he complained of or otherwise opposed discrimination; (2) his employer took an adverse action against him; and (3) a causal relationship exists between the complaint and the adverse action. McCrainey v. Kansas City Mo. Sch. Dist., 337 S.W.3d 746, 754 (Mo. App. W.D. 2011). As to the first element, the employee need not establish that the discrimination he opposed is actually prohibited by the MHRA; he need only have a "good faith, reasonable belief" that it is. Id.

24

In their motion for JNOV, Respondents argued that Caldwell failed to make a submissible case on the claim of retaliation because he did not proffer substantial evidence of opposing discrimination. See Koppe, 318 S.W.3d at 240; Mercer, 515 S.W.3d at 241–44. Caldwell posits that his May 8 Email demonstrates his opposition to discriminatory conduct. Resolution of this Point thus requires us to determine whether the email is the sort of "oppos[ition]" contemplated by the MHRA. See Section 213.070.1(2); Lin, 594 S.W.3d at 242.

"The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." Lin, 594 S.W.3d at 241–42 (internal citation omitted). As "oppose" is not defined within the MHRA, we understand its meaning by looking to the definition provided in the dictionary. See Morse v. Dir. of Revenue, 353 S.W.3d 643, 645 (Mo. banc 2011); see also Lin, 594 S.W.3d at 244 (analyzing the plain language of Section 213.070.1(2)). "Oppose" is defined, in relevant part, as "to offer resistance to, contend against, or forcefully withstand[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1583 (2002); see also Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn., 555 U.S. 271, 276 (2009) (applying the dictionary definition of "oppose" to interpret Title VII of the Civil Rights Act). Discrimination is defined by the MHRA as "any unfair treatment based on race, color, religion, national origin, ancestry, sex, age as it relates to employment, disability, or familial status as it relates to housing[.]" Section 213.010(5); Holmes, 364 S.W.3d at 626–27.

At trial, Caldwell presented evidence that his May 8 Email directly responded to Respondents' letter of May 7 in which Respondents placed Caldwell on unpaid FMLA leave on the basis that Caldwell was physically incapable of performing the DSM role. At that point,

Caldwell had not yet had spinal surgery, but he was released by his physician to return to work with limitations. Caldwell requested Seever to allow him to return to work. Seever said he did not have "clearance" to do so and then followed up with the May 7 letter.

In his May 8 Email to Respondents, Caldwell expressly objected to being "forced" to go and remain on unpaid leave. Critical for purposes of our analysis, in his May 8 Email, Caldwell attributed Respondents' decision to place him on leave *specifically to Caldwell's disability*. See Sections 213.010(5) –.055.1(1)(a); Clark, 623 S.W.3d at 209 (finding complaints of general mistreatment insufficient to support a retaliation claim). The record shows that Caldwell specifically challenged Respondents' assessment that his physical impairment rendered him incapable of fulfilling the essential functions of his job. Caldwell further averred that, had Respondents permitted him to return to work, he was able to perform as a DSM. Lastly, Caldwell expressed his clear disagreement that lifting eighty pounds was an essential part of his job.

Drawing reasonable inferences in Caldwell's favor, as we must, a jury reasonably could conclude that with his May 8 Email, Caldwell informed Respondents of his disagreement with and opposition to the alteration in the terms or compensation of his employment with a good-faith and reasonable belief that the alteration was unfairly motivated by his disability.[12]   See id.; McCrainey, 337 S.W.3d at 754.

---

[12] Citing Lin, Respondents suggest that the May 8 Email is merely a request for accommodation, which, as a matter of law, cannot support an MHRA retaliation claim. See Lin, 594 S.W.3d at 244. To support their argument, Respondents focus on a single line in the email, where Caldwell asks to return to work and complete his managerial duties. Assuming, without deciding, that this line is a request for accommodation, Respondents misconstrue the scope of Caldwell's email. As we set forth in the opinion, and under our standard of review, the jury reasonably could find that the May 8 Email was not simply a request for accommodation, but a clear expression of opposition to UniFirst's conduct toward him because of his disability. Respondents' reliance on Lin is inapposite.

26

Because we find substantial evidence supporting a jury finding that Caldwell opposed discrimination on the basis of disability, Point Two is granted. See McCrainey, 337 S.W.3d at 754; McKinney, 604 S.W.3d at 686–87.

## III.	Point Three—Workers' Compensation Retaliation

Lastly, Caldwell challenges the trial court's grant of JNOV to Respondents on his Workers' Compensation Law retaliation claim.

Section 287.780 prohibits employers from retaliating against an employee who files a workers' compensation claim. Hickman, 887 S.W.2d at 630. To prevail on his workers' compensation retaliation claim, Caldwell needed to establish: (1) he was employed by UniFirst before the injury; (2) he filed a workers' compensation claim; (3) UniFirst terminated him; and (4) there was a causal relationship between the filing of his claim and his termination. See Hickman, 887 S.W.2d at 630. After the jury found in favor of Caldwell, the trial court granted Respondents' motion for JNOV on the element of causation, which is the only issue before this Court. See Koppe, 318 S.W.3d at 240; Mercer, 515 S.W.3d at 241–44.

This claim's causation element is subject to the same "contributing factor" standard of proof discussed in the previous section involving the MHRA. See Templemire v. W & M Welding, Inc., 433 S.W.3d 371, 373 (Mo. banc 2014).[13] As we have already described, a "contributing factor" has a part in producing the effect. Lomax, 243 S.W.3d at 482. At trial, Caldwell could proffer direct as well as circumstantial evidence to establish a retaliatory causal relationship. See Holmes, 364 S.W.3d at 629.

---

[13] The "contributing factor" causal standard was applied in retaliation claims under Missouri's Workers' Compensation Law until August 28, 2017. See Templemire, 433 S.W.3d at 373; see also Section 287.780, RSMo (Cum. Supp. 2018) (implementing a "motivating factor" causal standard).

Missouri caselaw has recognized that a "very close []" temporal relationship between the engaging in protected activity and the adverse action may be circumstantial evidence probative of a retaliatory motive but alone is rarely sufficient to establish a causal relationship. See Medley, 173 S.W.3d at 325–26 (citing Buettener v. Arch Coal Sales Co., 216 F.3d 707, 715–16 (8th Cir. 2000)) ("[M]ore than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists."). Compare Turner v. Kansas City Pub. Schs., 488 S.W.3d 719, 723–24 (Mo. App. W.D. 2016) (emphasis added) (a temporal relationship of less than one month, *plus additional circumstantial evidence*, is sufficient to raise an inference of retaliation) with Kipp v. Mo. Highway and Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of two months between the complaint and . . . termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [the employee's] favor on the matter of causal link.").

Here, Caldwell filed his workers' compensation claim on March 12, 2015. Respondents terminated Caldwell's employment on July 27—more than four months after Caldwell filed his workers' compensation claim. Viewing the evidence in Caldwell's favor, however, the jury reasonably could have found that the decision to fire Caldwell was already in place on June 23, when HR Representative advised Seever by email that he could not fire Caldwell until his approved non-FMLA leave expired. See Turner, 488 S.W.3d at 723 (noting the relevant consideration is whether the employee's engaging in protected activity "contributed to the *decision* to fire [him]"). But even drawing this favorable inference yields a gap of three months between the filing of Caldwell's workers' compensation claim and his subsequent termination. See Kipp, 280 F.3d at 897. We conclude that the interval of over three months dilutes an

28

inference of retaliatory motive and cannot, without more, carry Caldwell's burden to establish retaliation.  See Medley, 173 S.W.3d at 325–26; Kipp, 280 F.3d at 897.

As additional circumstantial evidence to support his charge of retaliation for filing the workers'compensation claim, Caldwell directs us to Coworker's testimony that placing Caldwell on FMLA was part of a plot to "burn up" all of his protected leave.  In light of our standard of review, we credit Coworker's testimony that the forced FMLA leave was part of a scheme leading to Caldwell's termination.  See Darks, 601 S.W.3d at 254.  Still, we find no evidence probative of a causal nexus between the filing of the workers' compensation claim and the decision to place him on leave.  See Lomax, 243 S.W.3d at 482.  We agree with the trial court's assessment that Respondents finalized their decision to place Caldwell on FMLA leave on February 24, *approximately three weeks before Caldwell filed his workers' compensation claim*.  See Denn v. CSL Plasma, Inc., 816 F.3d 1027, 1036 (8th Cir. 2016) (finding no retaliatory motive when an employer had approved disciplining an employee, with HR's consent, "nearly a month before" the employee engaged in protected activity).

Caldwell also maintains that Coworker's testimony of Seever's discriminatory remarks is strong evidence of the retaliatory motive.  We disagree.  As we have described above, while that testimony constituted substantial evidence of discrimination on the basis of disability, such remarks raised no inference of retaliation due to Caldwell filing a workers' compensation claim. We are not permitted to supply missing evidence or grant Caldwell the benefit of forced or speculative inferences.  See Hickman, 887 S.W.3d at 630.

We note that in his closing argument, Caldwell appeared to embrace a theory that Seever's discriminatory comments, as well as Respondents' decision to place him on FMLA

29

leave, raised inferences of animus toward Caldwell's disability but not his workers' compensation claim. Referencing his back injury, Caldwell argued:

> We all remember [Coworker]. He testified that Seever [and another employee] made fun of [Caldwell] about his back. They mocked him. They mocked him. They joked about [Caldwell's] disability. Managers at UniFirst laughed about [Caldwell's] disability. They plotted to get him fired. Burn up his leave time, that's what [Coworker] said. They wanted him to burn up his time so that he'd be fired.

Then, describing Respondents' failure to provide a reasonable accommodation, Caldwell argued: "Why would they do this? Why? . . . They wanted him gone, burn up his time, get him out, move on. Defendants don't even have a good faith process for employees with disability to request accommodations."

In short, although Caldwell set forth substantial evidence that he may have been discharged on the basis of disability discrimination, we are persuaded that the record contains no evidence, circumstantial or otherwise, that UniFirst's decision to terminate Caldwell was causally related to his workers' compensation claim. See Medley, 173 S.W.3d at 325–26. Thus, the trial court did not err in granting JNOV on Count IV, and we deny Point Three. See Darks, 601 S.W.3d at 259.

## IV. Attorneys' Fees

The MHRA authorizes awarding "reasonable attorney fees to the prevailing party" in an MHRA action. Section 213.111.2; Harrison, 626 S.W.3d at 860 (citing Wilson v. City of Kansas City, 598 S.W.3d 888, 896 (Mo. banc 2020)). "A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing the suit." Wilson, 598 S.W.3d at 898 (internal citation omitted).

Caldwell successfully appealed his MHRA claims for disability discrimination and retaliation. See id. Having succeeded on a significant issue, Caldwell is a prevailing party, and we grant his request for reasonable attorneys' fees and expenses on appeal. See id. Although

30

this Court is authorized to grant fees, the circuit court is better equipped to hear evidence and argument and to evaluate the reasonableness of the requested fees. See id. We remand to the trial court to determine and award Caldwell reasonable attorneys' fees and expenses on appeal. See id.

Conclusion

The trial court's judgment is affirmed in part and reversed in part. We affirm the judgment as to Count IV. We reverse the judgment on Counts I and III and remand the cause to the trial court with instructions to reinstate the jury's verdicts for Counts I and III consistent with this opinion, and to enter judgment in favor of Caldwell. Caldwell's request for reasonable attorneys' fees and expenses on appeal is granted, and we further remand this matter to the trial court to determine and enter an appropriate amount.

_____
KURT S. ODENWALD, Presiding Judge

Michael E. Gardner, J., concurs.
Renée D. Hardin-Tammons, J., concurs.